**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICHAEL GALLEGOS,
　　　　*Petitioner-Appellant,*

　　　　v.

CHARLES L. RYAN,
　　　　*Respondent-Appellee.*

No. 08-99029

D.C. No.
2:01-cv-01909-NVM

ORDER AND
OPINION

Appeal from the United States District Court
for the District of Arizona
Neil V. Wake, District Judge, Presiding

Argued and Submitted
December 10, 2010—Pasadena, California

Filed April 7, 2016

Before: Marsha S. Berzon, Consuelo M. Callahan,
and Carlos T. Bea, Circuit Judges.

Order;
Dissent to Order by Judge Berzon;
Dissent to Order by Judge Callahan;
Opinion by Judge Berzon

## SUMMARY[*]

### Habeas Corpus

The panel, in an opinion, affirmed the district court's denial of habeas corpus relief on ineffective assistance of counsel claims, and, in an order, remanded the case for consideration of a *Brady* claim based on newly discovered evidence, in a case in which Arizona state prisoner Michael Gallegos challenges his conviction and death sentence for first-degree murder and sexual conduct with a minor.

Given the Antiterrorism and Effective Death Penalty Act's highly deferential standards, and the extreme difficulty the trial attorney would have had in presenting either a viable guilt phase defense or a stronger penalty presentation, the panel had no choice but to conclude it was not objectively unreasonable for the state court to deny Gallegos's ineffective assistance of counsel claims.

As to Gallegos's challenge to his lawyer's basic strategy during the guilt phase—specifically, his decisions to concede guilt and not pursue before the jury a coherent legal theory that could have resulted in a conviction of some offense less than first-degree murder—the panel held that the state court reasonably concluded that counsel's representation was not constitutionally ineffective and, to the extent it may have been, was not prejudicial under Supreme Court precedent. As to other aspects of the guilt phase representation— specifically, contentions that the lawyer vilified Gallegos and

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

failed adequately to investigate the technical defense or prepare his cross-examination of a medical examiner—the panel concluded that the state court reasonably determined that Gallegos suffered no prejudice as a result of his lawyer's purportedly deficient conduct, and affirmed on that ground alone.

The panel rejected Gallegos's claims that counsel at sentencing were ineffective for failing fully to prepare and present mitigating evidence concerning his health and personal history, where any of the evidence that could have been introduced at sentencing would have been cumulative of evidence already presented in detail at the sentencing hearings, and the district court's application of *Strickland* was therefore not objectively unreasonable.

In the simultaneously-filed order, the panel (1) denied Gallegos's Motion for Stay and Partial Remand and Reconsideration in Light of *Martinez v. Ryan*; and (2) granted in part Gallegos's Motion to Remand to the District Court and Request for Authorization of Federal Habeas Counsel to Appear in State Court Litigation. The panel instructed the district court on remand to consider in the first instance whether to permit Gallegos to supplement his existing petition with his *Brady* claim based on newly discovered evidence, and wrote that the district court may permit an evidentiary hearing on the issue whether that claim is timely under 28 U.S.C. § 2244(d)(1)(D). Dissenting in part, Judge Berzon would grant the Motion for Stay and Partial Remand for the district court to evaluate whether Gallegos can show cause and prejudice in light of *Martinez*. Dissenting in part, Judge Callahan would deny the motion to remand based on an alleged *Brady* claim and would find that the proposed *Brady* claim is untimely.

## COUNSEL

Jon M. Sands, Federal Public Defender, Ashley McDonald and Jaleh Najafi, Assistant Federal Public Defenders, Phoenix, Arizona, for Petitioner-Appellant.

Terry Goddard, Attorney General, Kent Cattani, Chief Counsel, and Jon G. Anderson, Assistant Attorney General, Capital Litigation Section, Phoenix, Arizona, for Respondent-Appellee.

## ORDER

The panel **DENIES** petitioner-appellant Michael Gallegos's Motion for Stay and Partial Remand for Reconsideration in Light of *Martinez v. Ryan*.

The panel **GRANTS IN PART** Gallegos's Motion to Remand to the District Court and Request for Authorization of Federal Habeas Counsel to Appear in State Court Litigation and **REMANDS** the case to the District Court for further consideration. On remand, the District Court shall consider in the first instance whether to permit Gallegos to supplement his existing petition with his *Brady* claim based on newly discovered evidence. The District Court may permit an evidentiary hearing on the issue whether that claim is timely under 28 U.S.C. § 2244(d)(1)(D). The panel retains jurisdiction over any appeal.

BERZON, Circuit Judge, dissenting in part:

I agree that we should remand as to the *Brady* issue. I would, however, also grant the Motion for Stay and Partial Remand for Reconsideration in Light of *Martinez v. Ryan*. Petitioner-appellant Gallegos has presented this panel with potentially mitigating evidence of organic brain damage sufficient to render his claim of ineffective-assistance-of-sentencing-counsel a "new claim" under *Dickens v. Ryan*, 740 F.3d 1302 (9th Cir. 2014). I would remand to the District Court to evaluate whether Gallegos can show cause and prejudice in light of *Martinez v. Ryan*, 132 S. Ct. 1309 (2012).

CALLAHAN, Circuit Judge, dissenting in part:

I concur in the denial of Michael Gallegos' motion to remand in light of *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). I dissent from our grant of his motion to remand based on an alleged claim under *Brady v. Maryland*, 373 U.S. 83 (1963).

I would find that Gallegos' proposed *Brady* claim is untimely pursuant to AEDPA's one-year period of limitations. *See* 28 U.S.C. § 2244(d)(1) ("a 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court."); *Mardesich v. Cate*, 668 F.3d 1164, 1173 (9th Cir. 2012) (applying "the AEDPA statute of limitations on a claim-by-claim basis"). The motion—Gallegos' first suggestion that he has a *Brady* claim—was filed in the Ninth Circuit just one day short of the anniversary of our decision in *Milke v. Ryan*, 711 F.3d 998, 1020–21 (9th Cir. 2014). It

does not appear that Gallegos has filed such a claim in an Arizona state court, or in the federal district court. Gallegos appears to be relying on his motion to somehow stay the time for seeking relief in the state court or district court. But the materials before us reveal that even if a *Brady* claim could be raised for the first time in a motion on appeal, here the motion is untimely.

A number of factors compel this conclusion. First, Detective Saldate's misdeeds were recorded in state court decisions that issued in 1989 and 1990. *See Milke*, 711 F.3d at 1020–21. Thus, the information was not something that was hidden from, or unavailable to, Gallegos. It was in the public domain, presumably available to all, years before Gallegos filed his motion to remand.

Second, the Arizona Federal Public Defender—the office that has represented Gallegos since at least February 2009—raised similar allegations concerning Saldate in *Runningeagle v. Ryan*, 686 F.3d 758 (9th Cir. 2012). The December 2009 opening brief in *Runningeagle* indicates that even if Gallegos's counsel did not actually know about Saldate's misdeeds, they should have known about them well before the March 2013 opinion in *Milke*. The Arizona Federal Public Defender's Office does excellent work on death penalty cases. It seems incredible to me that in light of the allegation that Saldate had "been repeatedly accused of improper behavior and coercive interrogation," the attorneys representing Gallegos were unaware of Saldate's flaws. Certainly, they could not have been unaware of the relevance of Saldate's character, as the trial court denied the motion to suppress based on his testimony.

Third, the motion only represents what defense counsel did *after* we issued our opinion in *Milke*. After *Milke*, counsel attempted to speak to Saldate and requested documents from the Maricopa County Attorney's Office. Counsel alleges that then, in the summer of 2013, they learned that "all of Det. Saldate's files had been destroyed by unknown persons on unknown dates." Motion at 4. However, counsel's efforts in 2013 simply do not excuse the failure to act sooner.[1]

Accordingly, I would deny Gallegos' motion to remand based on an alleged *Brady* claim as untimely pursuant to 28 U.S.C. § 2244(d)(1).

## OPINION

BERZON, Circuit Judge:

An Arizona jury found petitioner Michael S. Gallegos guilty of first-degree murder and sexual conduct with a minor. The allegation against Gallegos was that he had anally raped and killed eight-year-old Kendall Wishon, a girl his brother had raised as a daughter. The trial judge sentenced him to death under the Arizona sentencing scheme

---

[1] Contrary to the implication raised in the motion to remand, it is not unusual that documents that no one had looked at or requested in over twenty years would no longer be available.

then in place.[1]   After exhausting his state court remedies, Gallegos filed a federal habeas petition seeking relief from his conviction and sentence.  The petition alleged, among other things, that Gallegos's counsel was unconstitutionally ineffective at both the guilt and penalty phases of his trial. *See Strickland v. Washington*, 466 U.S. 668 (1984).  The district court denied relief, and Gallegos appealed.

Our review of the state court's determinations is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  Given AEDPA's highly deferential standards as interpreted in recent United States Supreme Court cases, and the extreme difficulty the trial attorney would have had in presenting either a viable guilt phase defense or a stronger penalty phase presentation than he did, we have no choice but to conclude it was not "objectively unreasonable" for the state court to deny Gallegos's ineffective assistance of counsel claims.  *See* 28 U.S.C. § 2254(d); *see also, e.g.*, *Harrington v. Richter*, 131 S. Ct. 770, 788–92 (2011).[2]

---

[1] Arizona's judicial sentencing in death penalty cases was later invalidated as an unconstitutional denial of the Sixth Amendment right to jury trial in *Ring v. Arizona*, 536 U.S. 584, 609 (2002).  *Ring* does not apply retroactively to cases like this one, in which the direct appeals were concluded before *Ring* was decided.  *See Schriro v. Summerlin*, 542 U.S. 348, 358 (2004).

[2] Simultaneously with the filing of this opinion we are filing an order remanding the case for consideration of a *Brady* claim based on newly discovered evidence.   That evidence principally concerns the constitutional legality of the confession.  This opinion assumes, but does not decide, that the confession was admissible.  We do not now determine whether, if the confession was not admissible, the habeas petition would be granted.

## I. BACKGROUND

### A. Factual History

Gallegos grew up in Flagstaff, Arizona.[3] His older brother, Jerry Gallegos, Jr., lived in Phoenix with Cindy Wishon and Cindy's eight-year-old daughter, Kendall. Cindy also had a teenage son from a previous relationship, George Smallwood, who was living with Gallegos and his parents in Flagstaff. Gallegos and Smallwood attended school together and were close friends.

In March 1990, during spring break of their senior year in high school—about a week after Gallegos turned eighteen—he and Smallwood traveled to Phoenix to stay with Jerry, Cindy, and Kendall. On Thursday of that week, Gallegos and Smallwood went to the garage where Jerry worked as a car mechanic. They drank beer, and Jerry supervised them while they fixed their cars. Around 9:30 p.m., the three returned to Jerry's home, resumed working on Gallegos's transmission in Jerry's carport, and continued drinking alcohol. About an hour later, Gallegos and Smallwood went inside and began playing video games. Kendall took a bath and went to bed, and Cindy and Jerry retired to bed shortly thereafter. Gallegos and Smallwood stayed up playing games and drinking beers.

Later that night, Kendall was sexually abused and killed. Gallegos gave detailed confessions to two police officers

---

[3] We base our recitation of the facts on the Arizona Supreme Court opinion upholding Gallegos's conviction and sentence on direct appeal, *see State v. Gallegos*, 178 Ariz. 1 (1994) ("*Gallegos I*"), and on our own review of the record.

soon after Kendall's death and testified at trial to his involvement in the crimes. It is his version that follows:

While they were playing video games, Gallegos suggested to Smallwood that they go into Kendall's room and "fondle" her. To Gallegos's surprise, Smallwood agreed. On their way upstairs, one of the two retrieved a bottle of baby oil from the bathroom, and they both entered Kendall's room. Gallegos lifted up Kendall's nightgown and rubbed the baby oil on the small of her back. When she began to wake up, Smallwood put his hand over her mouth; Gallegos put his hand over Smallwood's hand and over Kendall's nose. Kendall gasped for air, struggled, grunted, and went limp.

Gallegos and Smallwood believed Kendall was dead. Smallwood said that they might as well "finish her off," and they pulled her off the bed and onto the floor. Smallwood attempted, unsuccessfully, to vaginally penetrate her. Gallegos then had anal intercourse with Kendall's body for 15 to 20 minutes, using the baby oil as a lubricant, and eventually ejaculated. During this time, Smallwood placed his penis in her mouth, but did not ejaculate.

When Gallegos and Smallwood finished committing these unfathomable acts, they carried Kendall's naked body out of the house. Gallegos made sure the house was locked when they left, so that if his brother woke up, he would not wonder why the door had been opened and start checking around the house. They dropped her body under a nearby tree, returned to the house, locked the door again, and went to bed.

The next morning, Cindy and Jerry woke up as usual. After Cindy gave some money to Smallwood to purchase milk, she and Jerry left for work, and Smallwood went to the

store. Upon his return, Smallwood told Gallegos that he could not find Kendall and he asked Gallegos what to do. The two decided to call Cindy, Jerry, and the police, and inform them Kendall was missing.

Shortly thereafter, the police arrived and organized a search. Gallegos and Smallwood participated but intentionally avoided the area where they had dropped Kendall's body the night before. After several hours of searching, the police found the body underneath the tree where Gallegos and Smallwood had left it, only 250 feet from the house.

After discovering the body, the police searched Jerry and Cindy's house, seizing as articles of evidence Kendall's underwear, nightshirt, and bedsheet. In the kitchen, they found several empty beer cans and two empty cardboard beer cartons in a trash container. They also observed several hard liquor bottles on the kitchen shelves. In the carport, they noted a box filled three or four feet high with empty beer and soda cans. Jerry later testified at trial that he had given Gallegos and Smallwood about four to six beers each, and, after checking the next morning, he saw nothing suggesting any additional beers of his had been consumed.

Having found no signs of forced entry, the police began to suspect Gallegos and Smallwood were involved in Kendall's death and took them to the police station for questioning. According to Detective Armando Saldate, Jr., after escorting Gallegos and Smallwood into separate rooms, he advised Gallegos of his *Miranda* rights and questioned

him about the previous night; detective Michael Chambers simultaneously questioned Smallwood.[4]

Gallegos initially denied involvement in the murder. Officer Saldate, however, told Gallegos he did not believe him and urged him to tell the truth. After some hesitation, Gallegos confessed to his participation in the crime, relaying details about his intoxication, Kendall's murder, the sexual assault, and Smallwood's involvement in the events. Gallegos a little while later confessed a second time to the same details, this time in the presence of both detectives Saldate and Chambers.[5]

Smallwood, for his part, denied any involvement in Kendall's death or the sexual assault. He claimed that if Gallegos implicated him, it was only because he did not want to take the blame alone. Gallegos and Smallwood were subsequently indicted for first-degree murder and sexual conduct with a minor.

The police submitted for DNA analysis the physical evidence obtained at the crime scene as well as blood and saliva samples from Gallegos, Smallwood, and Kendall. The testing revealed that Smallwood "could not be included as a

---

[4] The *Brady* motion concerns the truth of Detective Saldate's account at trial of the confession. For present purposes, we summarize and rely on the trial record.

[5] The trial court determined these confessions were voluntary. Gallegos did not challenge that determination in his petition for habeas relief.

contributor to the evidence," and the state dismissed the charges against him.**[6]**

The physical evidence did, however, implicate Gallegos: (1) A fingerprint matching his finger was removed from Kendall's bedroom; (2) semen was detected on Kendall's underwear, nightshirt, and bedsheet; (3) DNA testing showed that the stain on Kendall's underwear contained a banding pattern matching Gallegos's blood; and (4) the probability that an individual other than Gallegos was the source of the stain was 1 in 10 million for Caucasians and 1 in 67 million for Hispanics, which Gallegos is.

## B.  Procedural History

### 1.  *The Guilt Phase*

Given Gallegos's detailed confessions and the compelling physical evidence against him, Greg Clark, Gallegos's lawyer, was confronted with an exceedingly difficult task in formulating a defense.  Gallegos faced the death penalty if convicted of first-degree murder, which, of course, included premeditated murder.  *See* ARIZ. REV. STAT. § 13-1105(A)(1) & (C) (1989).**[7]**  He also faced the death penalty if convicted

---

**[6]** Gallegos's confessions and testimony were the only evidence implicating Smallwood. At Gallegos's trial, Smallwood invoked his Fifth Amendment right not to testify.

**[7]** Unless otherwise noted, all references to the Arizona criminal code are to the provisions as they existed at the time of the crime, trial, and conviction.

of first-degree felony murder. *See id.* § 13-1105(A)(2).**[8]** In the context of this case, first-degree felony murder required proof that Gallegos "commit[ted] or attempt[ed] to commit sexual conduct with a minor" under the age of fifteen, and that "[i]n the course of and in furtherance of such offense or immediate flight from such offense, [Gallegos] or another person cause[d] the death of any person." *See id*. § 13-1105(A)(2).

The first of the two predicate felonies that could have supported a conviction for first-degree felony murder, "sexual conduct with a minor," required the prosecution to prove (1) that Gallegos knowingly penetrated Kendall's anus with any part of his body, and (2) that Kendall had not reached her fifteenth birthday. *See id*. §§ 13-1401, 13-1405. The alternative predicate felony that could have supported a conviction for first-degree murder, *attempted* sexual conduct with a minor, required proof of one of three things: (1) that Gallegos intentionally engaged in conduct which would have been a crime if the attendant circumstances were as he believed them to be; (2) that he intentionally committed any act which was a step in a course of conduct planned to culminate in commission of a crime; or (3) that he engaged in conduct intended to aid another to commit a crime, in a manner which would make him an accomplice, had the crime been committed or attempted by the other person. *See id*. § 13-1001(A)(1)–(3).

---

**[8]** *Cf. Enmund v. Florida*, 458 U.S. 782, 797 (1982) (holding that the Eighth Amendment requires finding that a felony murder defendant killed or attempted to kill); *Tison v. Arizona*, 481 U.S. 137, 158 (1987) (qualifying *Enmund* by holding that the Eighth Amendment permits the execution of a felony murder defendant who is a "major participa[nt] in the felony committed" and who demonstrates "reckless indifference to human life").

To avoid the possibility of the death penalty, then, Clark had to defend against both premeditated and felony murder. In addition to those offenses, the jury was instructed on second degree murder and reckless manslaughter.

Clark never attempted to convince the jury that Gallegos was not involved in the crime. To the contrary, he conceded in his opening statement that Gallegos was "absolutely responsible" for Kendall's death and warned the jury that he would "ask [them] to convict [his] client." He did not, however, specify of what offense Gallegos was guilty, cautioning that the proceedings were "not quite at that point yet."

Clark went on to develop a case against premeditated murder, by, in the main, portraying Gallegos as a confused, scared teenager who made a terrible mistake and never intended to kill Kendall. Detective Saldate, the officer who first obtained Gallegos's confession, testified for the State. During cross-examination, he was emphatic that he believed Gallegos's description of the crime, including Gallegos's insistence that he did not mean to kill Kendall and "things just got carried away." He also told the jury that Gallegos was "sobbing" while he confessed.

Clark also called Gallegos himself to testify for the defense. Gallegos gave some personal background, relaying that he was in high school and had a learning disability that seriously affected his spelling and math skills. He also provided in detail his account of the night of the crime, explaining that he participated in Kendall's death and sexual assault but never meant to kill her. According to Gallegos, he entered Kendall's room intending only to fondle her, and rubbed her back with oil because he liked "the feel of baby oil

on skin." She started to "stir, to wake up" because, he surmised, the baby oil was cold. As she awoke, Smallwood put his hand over Kendall's mouth, and Gallegos put his hand over Smallwood's and over Kendall's nose in an effort to keep her quiet. Gallegos "didn't realize [he] was hurting her. [He] had no intentions of hurting her." "She didn't struggle very long," Gallegos said, "[s]he just went limp." He admitted that he initially lied to the police about his involvement but explained that he did so only because he was "scared." Gallegos maintained that he considered Kendall part of his family, and, aside from being severely intoxicated at the time of the crime, he could not explain why he did what he did. Clark thus mustered some potentially persuasive evidence against premeditated murder: Gallegos, who was quite young and not unsympathetic, had convinced the detective most familiar with his case that he never meant to kill Kendall, the detective so testified, and Gallegos himself confirmed that account to the jury.

But felony murder, whether predicated on committing or on attempting to commit sexual conduct with a minor, was a much harder charge to defend. Gallegos had confessed to anally raping Kendall, and DNA evidence corroborated that account. As he could not plausibly deny the sexual assault occurred, Clark devised a technical defense—that Kendall had died *prior* to the rape, so Gallegos did not assault a "person," as required by the pertinent Arizona statute.[9] Clark also hoped to establish that Gallegos was severely intoxicated and so could not have had the requisite mental state to

---

[9] The applicable statute provided: "A person commits sexual conduct with a minor by intentionally or knowingly engaging in sexual intercourse or oral sexual contact with any *person* who is under eighteen years of age." Ariz. Rev. Stat. § 13-1405(A) (emphasis added).

commit *attempted* sexual conduct with a minor—specifically, that Gallegos could not have acted "intentionally."[10]

As the trial progressed, Clark attempted to develop evidence supporting those theories: Gallegos testified that after he held his hand over Kendall's nose, she went limp, and he thought he had killed her. He also claimed he had smoked marijuana, and drunk scotch, tequila, and very large quantities of beer that day, so he was severely intoxicated when the crime occurred. Detective Saldate confirmed that Gallegos, in his confession, stated that Kendall appeared dead before the sexual assault took place, and, moreover, Gallegos had admitted to drinking heavily throughout the day. Again, Detective Saldate emphasized he believed Gallegos was telling the truth as he relayed these details in his confession.

Clark did not, however, present any expert testimony confirming the sequence of Kendall's death and the sexual assault. The only expert testimony came from Dr. Bolduc,

---

[10] The Arizona criminal code, at that time, provided that "when the actual existence of the culpable mental state of intentionally or with the intent to is a necessary element to constitute any particular species or degree of offense, the jury may take into consideration the fact that the accused was intoxicated at the time in determining the culpable mental state with which he committed the act." *See* Ariz. Rev. Stat. § 13-503. Accordingly, on Clark's request, the court instructed the jury that, "[f]or the crime of *Attempted* Sexual Conduct with a Minor there must be proof that the defendant acted intentionally. If you determine that the defendant was intoxicated at the time, you may consider whether he could have committed the crime intentionally." (emphasis added). The charges of premeditated murder and sexual conduct with a minor required only that the conduct be committed "knowingly," so the instruction did not pertain to those charges. *Gallegos I*, 178 Ariz. at 11–12; *see also State v. Schurz*, 176 Ariz. 46, 54–55 (Ariz. 1993) (describing the intoxication instruction as it existed at the time of Gallegos's trial).

the medical examiner during the investigation of the crime, who testified for the State. According to Dr. Bolduc, Kendall's body exhibited bruises and abrasions, including a blunt force injury to her head, some of which appeared to have been inflicted while she was alive. Dr. Bolduc further testified that Kendall's rectum and anal canal were "markedly dilated," and that he observed "injected" capillaries and arteries in her rectum, meaning they stood out to the naked eye. He concluded, although not all that distinctly, that such capillary visibility would only result from injuries suffered while a person was still alive.

On cross-examination, Clark attempted to elicit that the dilation of Kendall's anal sphincter muscle was consistent with a rape that occurred *after* she had died, because that muscle is elastic and would spring back to its ordinary shape in a live individual. Dr. Bolduc, however, responded that, given Kendall's young age, her muscle might *not* have contracted back even had she been alive during the rape. Dr. Bolduc then reiterated, this time quite distinctly, that, while he could not be absolutely certain, it was his opinion that the injuries to Kendall's anus occurred, at least in part, prior to her death. On redirect, Dr. Bolduc emphasized that conclusion, stating that penetration would not have occurred "solely after death."

Just after the State presented its case—and so before Clark called Gallegos to testify—Clark moved outside the presence of the jury for acquittal of sexual conduct with a minor, articulating his technical defense that Kendall was not a "person" at the time of the rape. *See* ARIZ. R. CRIM. P. 20(a). To support his theory, Clark pointed out that, according to Gallegos's confession as relayed through Detective Saldate, Kendall had gone limp before the sexual

assault occurred.   Moreover, argued Clark, Dr. Bolduc admitted that he could not be certain about his opinion that the sexual assault began while Kendall was alive, although it was his considered opinion that it had.  The court denied the motion, finding there was sufficient evidence to allow the jury to determine that Kendall had not in fact died before the rape.

The court also analogized the circumstances to an Arizona Supreme Court case, *State v. Comer*, 165 Ariz. 413, 420–21 (1990), interpreting the state armed robbery statute.  Although that statute required contemporaneous use of force and taking of property, *Comer* rejected the argument that a robbery does not occur if property is taken after the victim is dead; a defendant can still be found guilty of robbery if he intended to take the victim's property before killing him, and the death occurred "in furtherance of his previously formulated plan to" take the property.  *See id.*  The court in Gallegos's trial, citing *Comer*, held that even if there was insufficient evidence to find that Kendall was alive during the rape, there was sufficient evidence for the jury to determine Gallegos had formed the intent to sexually assault Kendall prior to her death.[11]

---

[11] According to the trial transcript, the court said it would "analogize [to] State versus McCumber" in denying the motion to acquit.  We assume the court was referring to *State v. Comer*, and the name "McCumber" was a transcription error.  The court accurately described the holding of *Comer*, stating it was referring to instances "in the armed robbery area where the act of taking actually occurs after the death, and they talk about the intent."  Moreover, the State Supreme Court on direct appeal, relied on *State v. Comer* in rejecting Gallegos's argument that there was insufficient evidence to sustain a conviction of sexual conduct with a minor.  *See Gallegos I*, 178 Ariz. at 9.

After Gallegos testified for the defense, Clark renewed his motion for acquittal. It was again denied.

In closing argument, the prosecutor stated, "As you recall, Mr. Clark said he would ask you to find him guilty, but you recognize without any question it's a matter of what degree, what charge." The prosecution went on to explain the felony murder requirements and argued that "[t]he facts will . . . flush out strong support, support beyond a reasonable doubt . . . that charge of felony first degree murder is supported." The prosecutor also argued at some length for a premeditated murder conviction, commenting that it was "granted, probably a tougher question for you."

Clark, in his closing argument, conceded this was a difficult case and that Gallegos had committed an unspeakable crime. He admitted to treating Gallegos with "contempt" while he was on the stand, explaining that that approach helped to illustrate that Gallegos is a "child. . . . He's pathetic, he's despicable, but he's a child." He also reminded the jury that Detective Saldate, who had been a police officer for over 20 years, believed Gallegos when, in his confession, he lamented that he "never intended for this to happen." Clark suggested that the evidence established only reckless manslaughter, not premeditated murder, and he urged the jury to be "fair," although he did not explain what such treatment might entail. Notably, Clark did not articulate any defense to felony murder or to the predicate felonies of sexual conduct or attempted sexual conduct with a minor beyond referring vaguely to Dr. Bolduc's testimony, despite the prosecutor's emphasis on evidence supporting those crimes in his closing argument immediately prior.

After deliberating for just two hours, the jury found Gallegos guilty of both first-degree murder and sexual conduct with a minor.  The jury was unanimous as to first-degree murder but split (to a degree not recorded) as to whether Gallegos committed premeditated murder or only felony murder.  *Cf. Schad v. Arizona*, 501 U.S. 624, 644–45 (1991) (plurality opinion) (holding constitutional Arizona's scheme of providing general verdicts for first-degree murder based on either premeditation or felony murder, without requiring jury unanimity).

## 2.  *The First Sentencing Hearing*

Gallegos had two sentencing hearings.  At the first, the State presented only one witness, Cindy, who testified that the crime had had a devastating impact on her and her family.

Clark, for the defense, called Noah Stalvey, Gallegos's probation officer, who testified that Gallegos had gotten into some minor trouble—he had been arrested for stealing a chemistry scale from his high school and for possession of marijuana—but he was "likable, friendly," and "one of the kids that really came to [him] looking for some help."  He testified that Gallegos was "scared" and sorry for what he had done to Kendall.  Clark then called several of Gallegos's family members, who, in the main, asked for leniency and testified that Gallegos was remorseful.

Notably, Detectives Saldate and Chambers also testified for the defense, both strongly recommending against the death penalty.  Detective Saldate explained he was convinced Gallegos would not have committed the crimes without the involvement of Smallwood and without being intoxicated. Saldate emphasized that Gallegos's case was unique:  While

many of the investigations in which he had been the agent-in-chief ended with first-degree murder convictions, he had *never* recommended against the death penalty when it had been sought.

Detective Chambers testified that the circumstances suggested the murder may have been an "accident." He also considered Gallegos to be particularly immature and "unsophisticated," and noted that he found Gallegos to be remorseful. Like Saldate, Chambers had never recommended against the death penalty. In fact, quite the opposite was true: He had "about eight death sentences last year for defendants [he had] no compassion for."

Gallegos himself also testified that he never intended to kill Kendall and would trade places with her if he could. He expressed remorse, pleaded for mercy, and maintained he could rehabilitate himself if given the chance.

Finally, the sentencing court considered a presentence memorandum submitted on behalf of Gallegos, as well as numerous letters from his family, friends, and school employees.

Judge Hotham, the same judge who presided over the guilt phase of the trial, found that the State proved two statutory aggravating factors: (1) that Kendall was eight years old, and Gallegos eighteen, at the time of the crime; and (2) that Gallegos committed the crime "in an especially heinous, cruel, or depraved manner." *See* ARIZ. REV. STAT. § 13-703(F)(6) & (9). He further found that Gallegos carried his burden only as to one statutory mitigating factor—that he was young, only eighteen years old. *See* ARIZ. REV. STAT. § 13-703(G)(5). Judge Hotham also acknowledged the

detectives' recommendations and Gallegos's remorse as nonstatutory mitigating circumstances. Balancing the aggravating and mitigating factors, Judge Hotham sentenced Gallegos to death.

On appeal, the Arizona Supreme Court affirmed Gallegos's convictions but remanded the case for resentencing, finding Gallegos's impairment due to intoxication to be an additional nonstatutory mitigating circumstance not properly considered by the trial court. *See Gallegos I*, 178 Ariz. at 23.

### 3. *The Second Sentencing Hearing*

Gallegos was represented at the resentencing hearing by new counsel, John Antieau. Antieau called many of the same witnesses who had testified at the first hearing, including Gallegos's mother and sister, and Gallegos himself. Likewise, Detectives Saldate and Chambers again testified, both once more recommending emphatically against the death penalty.[12]

Additionally, Antieau called witnesses who had not testified at the first hearing, including: another of Gallegos's sisters, his brother-in-law, several of his friends, and his niece. Counsel also proffered a two-page letter from Dr. Charles Shaw, in which Shaw opined that (1) there was "[n]o question" Gallegos was an alcoholic, and (2) Gallegos had an

---

[12] The court considered the testimony from the first hearing given by Gallegos's older brother Jerry and by Gallegos's probation officer. The court also considered the presentence memorandum submitted in the first hearing.

estimated blood alcohol concentration of 0.10% to 0.20% at the time of the murder.  Shaw did not testify.

The State offered its own expert, Dr. Alex Don, who testified that Shaw's conclusions, based only on Gallegos's self-reporting years after the crime, amounted to "fanciful guessing."  In fact, Don stated, the evidence suggested that it was unlikely Gallegos was as intoxicated on the night of the crime as Shaw had concluded.

Judge Hotham found the same three mitigating circumstances as he had found in the first hearing, as well as two more nonstatutory mitigating factors:  (1) a history of alcohol and drug use; and (2) alcohol impairment on the night of the crime.  Nonetheless, he again sentenced Gallegos to death, stating that "[e]ach aggravating circumstance standing alone outweighs the total mitigation.  In other words, even if the Arizona Supreme Court told this Court to weigh the alcohol and drug history and impairment ten times, this Court would still find that each aggravating circumstance standing alone would outweigh all collective mitigation."

This time, the Arizona Supreme Court affirmed Gallegos's death sentence. *See State v. Gallegos*, 185 Ariz. 340, 348 (1996) ("*Gallegos II*"). The United States Supreme Court denied Gallegos's petition for certiorari. *See Gallegos v. Arizona*, 519 U.S. 996 (1996).

### 4.  *The State Post-Conviction Proceedings*

Gallegos then filed a petition for state post-conviction relief, arguing, among other things, that he was denied effective assistance of counsel at both the guilt and penalty

stages of trial. Judge Hotham held an evidentiary hearing to review these ineffective assistance claims.

At the hearing, Clark testified that, given the strength of the State's case, he felt it was necessary vividly to acknowledge the horrific details of the crime and to admit candidly Gallegos's involvement. Doing so, he hoped, would "draw the sting" from those facts and develop credibility with the jury, encouraging them to convict Gallegos of something less than first-degree murder. In particular, Clark defended his decision to call Gallegos to testify and acknowledged that he "pushed him when he was on the stand," because he felt that would help portray Gallegos as a "young man" who "simply made a bad mistake." The jury could not realistically make that assessment, according to Clark, if Gallegos sat there "being mute and emotionless." Clark had hoped that the jury would recognize Gallegos was not "cold-blooded and uncaring," but rather was "literally a child."

In addition, Clark explained his failed efforts to establish that Kendall had died prior to the sexual assault. He had known from a pre-trial interview that Dr. Bolduc could not be absolutely sure about whether Kendall was alive during the assault, and he had hoped to highlight that uncertainty on cross-examination. Clark also testified that while he had consulted with a medical expert, that expert could not provide an opinion directly contradicting Dr. Bolduc's.

Finally, Clark sought to justify his conduct during the first sentencing hearing:[13] He stated that he had worked with an investigator who helped him develop mitigating evidence, but

---

[13] Antineau died before the state post-conviction proceedings and so was unavailable to testify about the second sentencing hearing.

they had not uncovered anything of note, including nothing suggesting Gallegos had "mental problems." Gallegos's post-conviction relief counsel submitted no additional evidence supporting mitigating circumstances or undermining the aggravating factors found by the sentencing court.

The state trial court, Judge Hotham again presiding, denied Gallegos's petition for post-conviction relief. The court first declined to presume prejudice under the standard articulated in *United States v. Cronic*, 466 U.S. 648 (1984), because Clark's representation did not constitute total abandonment of his client, Gallegos. The court also reasoned that Clark's treatment of his client was not constitutionally deficient. While recognizing that Clark's descriptions of Gallegos's conduct were "harsh," the court surmised that they "probably added to counsel's credibility with the jury." Finally, the court concluded that Gallegos had not proven prejudice; the State's evidence was so "completely overwhelming" that there was no reasonable probability that the result of the trial would have been different absent any errors by counsel.

The Arizona Supreme Court denied Gallegos's petition for review.

### 5. *The Federal Habeas Proceedings*

Gallegos next filed a timely petition for a writ of habeas corpus in the U.S. District Court for the District of Arizona. He sought to expand the record, attaching various exhibits not presented in the state proceedings. The district court declined to expand the record or hold an evidentiary hearing, and eventually denied Gallegos's petition in its entirety.

The district court issued a certificate of appealability with respect only to Gallegos's claim that he was denied effective assistance of counsel at sentencing.  *See* 28 U.S.C. § 2253(c) (governing certificates of appealability).  Gallegos appealed, arguing that he received ineffective assistance of counsel at both the sentencing and guilt phases of his trial.[14]

## II.  DISCUSSION

AEDPA allows federal habeas relief with respect to claims "adjudicated on the merits in State court proceedings" only if the petitioner can show that the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).    The "clearly established" Supreme Court standard for ineffective assistance claims was set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on those claims, Gallegos must show (1) "that

---

[14] We construe Gallegos's inclusion of the claim of ineffective assistance of counsel at the guilt phase as a motion to expand the certificate of appealability.  *See* Ninth Circuit Rule 22-1(e).  We previously provided the State an opportunity to brief the issue and now grant Gallegos's motion.

counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense." *Id*. at 687.

Counsel's performance can be held constitutionally deficient only if it "fell below an objective standard of reasonableness . . . under prevailing professional norms." *Id*. at 688. We are "highly deferential" in reviewing counsel's performance and must be careful not to "conclude that a particular act or omission of counsel was unreasonable" simply because the defense was ultimately unsuccessful. *Id*. at 689. That deference requires application of a "'strong[] presum[ption]'" that counsel "'rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011) (quoting *Strickland*, 466 U.S. at 690).

To prove prejudice, Gallegos must "'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id*. at 1403 (quoting *Strickland*, 466 U.S. at 694). That standard "requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Id*. (quoting *Richter*, 131 S. Ct. at 791).

Moreover, AEPDA restricts our ability to correct what we perceive to be unconstitutionally deficient representation prejudicially infecting state court proceedings. "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Richter*, 131 S. Ct. at 785 (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)). In other words, our review of the Arizona state court's determinations regarding deficiency is "doubly deferential": "We take a highly deferential look at

counsel's performance [under the *Strickland* standard], through the deferential lens of § 2254(d)." *Pinholster*, 131 S. Ct. at 1403 (quotations omitted). Habeas relief, we have been instructed, is reserved for those instances where a petitioner can "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786–87.

On the present record, we cannot so characterize the state appellate court's rulings with regard to whether Clark's performance was deficient or whether any deficient representation could have affected the guilty or death penalty verdicts.

## A.  The Guilt Phase

Gallegos challenges several aspects of Clark's performance at the guilt phase of his trial, maintaining that Clark's conduct as to each was constitutionally deficient. Specifically, Gallegos (1) disputes Clark's decision to concede guilt and faults Clark for failing to pursue and articulate a coherent legal theory that could result in a conviction of some offense less than first-degree murder; (2) contends Clark vilified him while he was testifying as a witness, and in Clark's opening and closing statements; and (3) maintains that Clark's investigation of the technical defense was inadequate and his consultation with medical experts insufficient. Had Clark done more, Gallegos claims,

he would not have pursued the chosen defense or would have been better prepared to cross-examine Dr. Bolduc.[15]

We address first the challenge to Clark's basic strategy during the guilt phase—specifically, his decisions to concede guilt and not pursue before the jury a coherent legal theory that could have resulted in a conviction of some offense less than first-degree murder. As to that purportedly deficient conduct, we hold that the state court reasonably concluded that counsel's representation was not constitutionally ineffective and, to the extent it may have been, was not prejudicial under Supreme Court precedent.

Next, we go on to consider the other aspects of the guilt phase representation challenged as ineffective—specifically,

---

[15] Contrary to the State's contention, Gallegos did not procedurally default his claims that Clark was ineffective for failing adequately to consult an independent expert and for failing adequately to prepare to cross-examine Dr. Bolduc. Gallegos presented these claims in his supplemental petition for post-conviction relief. A copy of that petition was included in an appendix to his petition for review to the Arizona Supreme Court, which "is sufficient to present the issue[s] in a full and fair manner to the state courts." *Scott v. Schriro*, 567 F.3d 573, 582 (9th Cir. 2009) (holding a petitioner accomplished a "full and fair presentation of his claims" because they were "included [in] a copy of the amended petition for post-conviction relief," which was attached "in the appendix of his petition for review to the Arizona Supreme Court") (citing *Insyxiengmay v. Morgan*, 403 F.3d 657, 668 (9th Cir. 2005)).

That Gallegos now articulates his argument as a failure to *investigate*, with the aid of an expert, the technical defense before pursuing it does not change the nature of the claim such that it was not fairly presented. He advanced "to the state court the legal and factual basis of his federal constitutional claim"; he was "not required to present his arguments in the same amount of detail" to the state courts. *Robinson v. Schriro*, 595 F.3d 1086, 1102 (9th Cir. 2010).

the contentions that Clark vilified Gallegos and failed adequately to investigate the technical defense or prepare his cross-examination of Dr. Bolduc. As to those contentions, we conclude that the state court reasonably determined that Gallegos suffered no prejudice as a result of Clark's purportedly deficient conduct, and affirm on that ground alone. *See Bible v. Ryan*, 571 F.3d 860, 870 (9th Cir. 2009) (acknowledging that we "'need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.'" (quoting *Strickland*, 466 U.S. at 697)).

### 1. *Basic Strategy During Guilt Phase.*

### i.

To begin, the state court reasonably concluded that Clark was not deficient for conceding Gallegos's guilt[16]—by, for example, "ask[ing] [the jury] to convict [his] client"; admitting that Gallegos "caused the death of another person"; and confirming that his client was "absolutely responsible for the taking of Kendall's Wishon's life."

As a factual matter, although Clark never articulated for the jury a coherent basis for a lesser verdict, he did not concede that Gallegos was guilty of first-degree murder. Rather, in his opening statement he reminded the jury of the State's burden, arguing that Gallegos "is presumed to be innocent. He is innocent." In his closing argument, Clark

---

[16] We defer to the state trial court's post-conviction relief disposition of Gallegos's ineffective assistance of counsel claims as the state courts' "last reasoned judgment." *Brown v. Ornoski*, 503 F.3d 1006, 1010 (9th Cir. 2007).

"submit[ted] to [the jury] that all of the facts that [they had] heard certainly show that" Gallegos was guilty of "reckless manslaughter." His admission, therefore, was only that Gallegos was guilty of some offense involving Kendall's death; it was not a concession of a lack of reasonable doubt on *all* factual issues or of guilt of a capital offense. *See Hovey*, 458 F.3d 892, 906 (9th Cir. 2006) (holding counsel did not concede premeditation when he stated that "there could be findings . . . of willful, deliberate and premeditated," because "he made this point in the context of weighing the jury's options").

As a strategic matter, disputing Gallegos's involvement in the crime would have been unpersuasive given the evidence, and Clark's acknowledgment of his client's guilt in the killing could reasonably have been intended to establish credibility with the jury in the face of horrendous facts. *See, e.g.*, *id*., 458 F.3d at 906–07 (acknowledging that a concession of guilt can be a valid technique to protect credibility); *United States v. Thomas*, 417 F.3d 1053, 1057–58 (9th Cir. 2005) (same); *Anderson v. Calderon*, 232 F.3d 1053, 1088 (9th Cir. 2000) (same), *overruled on other grounds by Osband v. Woodford*, 290 F.3d 1036 (9th Cir. 2002). Establishing such credibility was important to further the strategy Clark *did* pursue, the strategy we now address.

## ii.

To avoid facing the death penalty at sentencing, it was necessary for Clark initially to convince the jury that Kendall's murder was not premeditated. Clark was somewhat successful in that respect, as evidenced by the jury's verdict, showing it was unanimous as to first-degree

murder but split as to whether Gallegos committed premeditated or only felony murder. In other words, at least one juror, and perhaps more, did not think the evidence supported premeditation.

But establishing a reasonable doubt about premeditation would not have precluded conviction of first-degree murder or eliminated the possibility of the death penalty, as Gallegos still faced the possibility of being convicted of first-degree felony murder. In his briefs on appeal, Gallegos largely ignores the felony murder basis for first-degree murder. He principally faults Clark for not articulating more clearly that Gallegos should have been convicted of lesser-included offenses such as second-degree murder or manslaughter, rather than for premeditated murder.

That argument misses the point. The evidence that Gallegos was guilty of *either* predicate felony—sexual conduct with a minor or attempted sexual conduct with a minor—was quite strong. Given the circumstances of the case, if either felony was established, a conviction of felony murder would then almost certainly have followed; the circumstances strongly supported the determination that Gallegos or another person "cause[d]" Kendall's death "[i]n the course of and in furtherance of such offense," as was required to find him guilty of felony murder. *See* Ariz. Rev. Stat. § 13-1105(A)(2). The prosecutor so emphasized in closing argument. The jury in fact accepted that argument: It returned a unanimous verdict of guilt for the predicate felony of sexual conduct with a minor, and a split verdict for first degree murder, some jurors finding him guilty of

premeditated murder and some finding him guilty only of felony murder.[17]

Gallegos does not argue that a juror might have convicted him of a predicate felony—as the jury unanimously did—yet *not* have found him guilty of felony murder. Thus, even if Clark successfully established that the murder was not premeditated, Gallegos could still have been convicted of felony murder and faced the death penalty at sentencing. In other words, under the *Strickland* prejudice prong, ineffective assistance with regard to premeditated murder, even if it occurred, cannot provide a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" at the guilt phase, *Strickland*, 466 U.S. at 694, unless Gallegos would also likely have prevailed on the felony murder issue. The focus of our

---

[17] On the jury verdict form, the jury was presented with three possible choices: (1) "Unanimous as to First Degree Premeditated Murder"; (2) "Unanimous as to First Degree Felony Murder"; and (3) "Unanimous as to First Degree Murder, but split as to whether it was Premeditated Murder or Felony Murder." The jury selected the third option. Gallegos suggested at oral argument on this appeal, for the first time, that the jury's verdict could be read as indicating that some jurors concluded that Gallegos was guilty of *only* premeditated murder and *not* felony murder. Given the unanimous verdict on the predicate felony and the absence of any viable theory as to how Gallegos could be guilty of the predicate felony but not felony murder, we think it evident that the jury meant only to record, among the choices given, the conclusion that some of the jurors were of the view that Gallegos was guilty of premeditated murder, and not *only* of felony murder. In any event, "'[i]n Arizona, first degree murder is only one crime regardless whether it occurs as a premeditated murder or a felony murder,'" *Schad v. Arizona*, 501 U.S. at 629 (quoting *State v. Schad*, 163 Ariz. 411, 417 (1989)), so it was the "Unanimous as to First Degree Murder" conclusion that mattered.

inquiry, therefore, is on the felony murder charge, and specifically on the predicate felonies themselves.

To defend against the felony murder charge, Clark came up with a novel, if disturbing, technical defense—that Kendall was dead before the assault occurred and so not a "person" under the pertinent statute. That defense was not *certain* to lose, but its chances of success were exceedingly slim. The only expert testimony at trial was that Kendall had been alive during at least part of the sexual assault. During cross-examination, Clark attempted to chip away at Dr. Bolduc's testimony, pointing out that the doctor was not certain of his conclusions and that the dilation of Kendall's anus could be inconsistent with the doctor's position. In the end, though, Dr. Bolduc's testimony went largely unrefuted and clearly conveyed his opinion that Kendall was alive at least when the assault began.

Gallegos maintains that, in light of Dr. Bolduc's unrebutted testimony, Clark never should have pursued the technical defense on which he settled. Importantly, however, Gallegos suggests no alternate theory, let alone one more likely to succeed than the one chosen. Absent any defense that could have promised a greater chance of success, we cannot conclude that Clark was deficient for choosing the one he did. "The choice to pursue a bad strategy makes no comment on an attorney's judgment where no better choice exists." *Hendricks v. Calderon*, 70 F.3d 1032, 1042 (9th Cir. 1995).

### iii.

As it turned out, Clark pursued the technical defense to the predicate felony only in legal motions before the judge

and not, for the most part, in arguments before the jury. The state court could reasonably have concluded that Clark was not constitutionally deficient for failing to articulate with any clarity to the jury the technical defense that Kendall had died prior to the assault. Importantly, it seems clear that, as a strategic matter, Clark never meant to direct that defense to the jury; it was meant primarily as a purely legal defense, a basis for a motion for acquittal. On this appeal, Gallegos does not contend otherwise, nor does he fault Clark for not arguing the technical "she was dead" defense to the jury.

The record supports the notion that both the theory itself and the plan to present it in the form of a motion for acquittal were strategic measures devised prior to trial. During pre-trial motions, for instance, the prosecutor recognized that "the bottom line is . . . what comes first, the cart or the horse, death or the sexual penetration. That's the issue. That's the issue in this case. That is the one sole primary issue." The prosecutor also correctly predicted that Gallegos would "get on the stand and say she was dead. She was limp. He doesn't even have to do that because that's what he told the detective, 'she went limp, and that's when I had anal penetration.' . . . And [that will be the argument] when Mr. Clark makes his Rule 20 motion [for acquittal]." As the prosecutor suspected, Clark did in fact make the argument to the court in a motion for acquittal.

A lawyer exercising reasonable professional judgment may well have chosen to tailor the technical defense for presentation to the court, not the jury. Clark recognized that his credibility was important in presenting to the jury the theory that the murder was not premeditated. The state post-conviction court reasoned that Clark's strategy was aimed at obtaining a conviction of a lesser-included offense, such as

second-degree murder or manslaughter. Gallegos, in his briefs on appeal, makes more or less the same argument, contending that Clark should have worked harder at persuading the jury to convict Gallegos only of such lesser-included offenses. Because Gallegos faced the possibility of first-degree felony murder, that strategy would have entailed hoping the jury would slide over the charge of first-degree felony murder—in other words, that it would exercise something akin to jury nullification.

In *Anderson v. Calderon*, we held a similar approach to a felony murder charge to be a "'strategic choice,'" falling within the "'wide range of reasonable professional assistance,'" and so not deficient. 232 F.3d at 1089 (quoting *Strickland*, 466 U.S. at 689). The trial court in that case refused to instruct the jury that it could find the defendant guilty of murder but not of burglary, a predicate for felony murder. *Id*. at 1087. That refusal was problematic for the defense, because it was "obvious" that the defendant had killed the victim, and the death penalty would have been available *only* for a conviction of felony-murder. *Id*. at 1087–88. The defense planned to present a diminished capacity defense to the burglary charge, but such a defense "would be asking the jury to acquit on both the charge of burglary and first degree felony murder," something the jury would be unlikely to do, given the defendant's clear participation in the murder. *Id*. at 1088. Given those circumstances, "[i]n effect, what [counsel] sought [in his closing argument] was jury nullification; to convict [the defendant] for murder, but to do so outside of the bounds of the jury instructions, thereby saving [the defendant] the possibility of the death penalty." *Id*.

In assessing adequacy of representation, we are "required not simply to give the attorneys the benefit of the doubt, but to affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as [he] did." *Pinholster*, 131 S. Ct. at 1407 (internal citation and quotations omitted). Doing so, we recognize that like the lawyer in *Anderson*, Clark, after losing (twice) on the motion to acquit on the technical defense to the predicate felony, could have seen his best hope as being that the jury might get lost in the morass of evidence and legal theories and convict Gallegos of some offense less than first-degree murder out of mercy or confusion, ignoring the charge of first-degree felony murder.

The alternative of explaining and arguing to the jury the technical, "she was dead first" defense was not attractive. Clark's technical defense to the predicate felony was convoluted, inherently repulsive, and unsympathetic. Pushing the defense before the jury would have hurt the chances of avoiding a premeditated murder conviction, as it required insisting—at the same time Clark was attempting to convince the jury that Gallegos was not an evil person and so not a cold-blooded killer—that Gallegos should be acquitted of sexual conduct with a minor because he "merely" raped a child's corpse. Even assuming a jury *might* accept such a counterintuitive, unpalatable legal argument if the evidence affirmatively supported the theory, the *only* expert testimony introduced at trial was directly to the contrary. Although the jury could have chosen to believe Gallegos's overall story, including his nonexpert perception as to when Kendall died, or to rely on Dr. Bolduc's minor equivocation as creating a reasonable doubt, the State's expert testimony went virtually unrefuted. There was therefore little Clark could have done in his statements to the jury to advance the technical argument that Kendall had died prior to the assault. Arguing

the point would only have highlighted the lack of evidence supporting it, undermined Clark's own credibility, and cast Gallegos in an awful light. The defense, in short, was quite unlikely to be successful with a jury, even as compared to a judge.

Given those circumstances, Clark might well have decided to make a "passive request that the jury reach some verdict, rather than an express demand for acquittal," *Yarborough v. Gentry*, 540 U.S. 1, 10 (2004), as the latter technique would have required wading into the unsympathetic and unpersuasive details of the felony defense. Consistent with that supposition, Clark did not entirely neglect the felony murder theory, but his reference to it was fleeting. The jury was aware of the technical defense, as the prosecutor in his closing statement implied that Gallegos had manufactured, in his confession to Detective Saldate, the story that Kendall had died prior to the assault, stating, "Does it work in conveniently because then the sodomy occurs after she's dead, therefore you cannot convict me?" Clark, in his closing, responded: "Mr. Stalzer has told you or intimated to you that my client, an 18-year-old high school boy, mere hours after this event happened, was quick enough and cunning enough to concoct some theory to defend himself with. I think you ought to be offended." Clark did not, however, explicate in what ways the evidence supported his technical theory. Beyond Gallegos's own statements, it really did not.

Instead, Clark emphasized his strongest evidence in his closing argument, even though it supported only a defense to premeditation, not felony murder. Clark repeatedly reminded the jury that Gallegos was an 18-year-old high school student, and described him as a "man-child" who "never intended for

this to happen." He also emphasized that Detective Saldate believed Gallegos's narrative, reminding them that Detective Saldate had "been a police office for 20-plus years," and urging them to "see what Detective Saldate saw. . . . He told you that he believed Michael Gallegos. Michael told him that he never intended for this to happen. And he told you that he believed him." These arguments were the "centerpiece of his case," *id*. at 6—namely, Gallegos committed these despicable acts, but he was young, and, moreover, a seasoned police officer believed his story that the death itself was unintentional and relatively non-violent.

After reminding the jury of this mildly favorable evidence, Clark concluded that "the facts that you have heard certainly" support a conviction of reckless manslaughter. What Clark did not tell the jury is that such a verdict was possible only if Gallegos was not guilty of felony murder. Clark could well have understood that there was no viable defense to that charge, and so thought it best to avoid the issue, hoping the jury might as well. It was an extremely risky tactic, but he could reasonably have believed there was no better alternative, a conclusion supported by Gallegos's failure on habeas to suggest a better approach to the felony murder charge. *See Anderson*, 232 F.3d at 1090.

A related strategy, supportive of Clark's chosen approach, is that once the motion for acquittal was denied, Clark hoped to avoid a unanimous conviction for premeditated murder, because such a conviction could have had negative consequences during the sentencing phase, as compared to a conviction of felony murder or a mixed verdict. Specifically, under Arizona law, it was a statutory mitigating factor that "[t]he defendant could not reasonably have foreseen that his conduct in the course of the commission of the offense for

which the defendant was convicted would cause, or would create a grave risk of causing, death to another person." Ariz. Rev. Stat. 13-703(G)(4). During the sentencing phase, Clark in fact urged the court to adopt that statutory mitigating circumstance, arguing that Gallegos was impaired during the crime and that he intended only to fondle Kendall. Clark continued, "all of a sudden this poor girl is not moving," and only then did Gallegos "realize[] what happened." Clark "firmly [did not] believe that [Gallegos] had the capacity to appreciate what, in fact, his actions were going to lead to." The court was not persuaded, and found the mitigating circumstance did not exist. Still, had Gallegos been convicted unanimously of premeditated murder, that *potentially* viable mitigating circumstance could not realistically have been pursued at all. And, as explained, highlighting the gruesome details underlying the technical theory would have seriously undermined Clark's attempts to convince the jury that the murder was not premeditated.

The trial court, moreover, had indicated that, even if the jury were to conclude that Kendall was dead at the time of the rape, Gallegos could still have been found guilty of the predicate felony, sexual conduct with a minor, so long as he formed the intent before her death to sexually assault her. That determination further reduced the chances that Clark's technical defense could have been successful if presented to the jury, providing additional incentive for Clark to avoid explicitly raising the defense in his closing argument. While Clark could have highlighted Gallegos's testimony that he formed the intent to rape Kendall only after her death, that testimony was largely uncorroborated, and plenty of contrary, damaging evidence existed. For one, Kendall's body was badly battered, and Dr. Bolduc opined that some of her bruises were inflicted while she was alive. That evidence cut

against Gallegos's narrative of the crime as being relatively non-violent, as well as the image that Clark was trying to portray of Gallegos as a child who had not intended to hurt Kendall.

Detective Saldate's testimony at trial, moreover, was inconsistent with the argument that Gallegos did not intend to rape Kendall until after she died: According to the detective, Gallegos had confessed he was thinking about the "last time he had had sexual intercourse" before he raised the possibility of fondling Kendall with Smallwood, and that he was "really . . . turned on" by the feeling of baby oil on skin. Detective Saldate further testified that Gallegos had told him he used the baby oil on his penis and Kendall's anus to facilitate the rape, permitting the inference that Gallegos had retrieved the oil for that purpose. Finally, when asked why he raped Kendall, according to Saldate, Gallegos responded that he and Smallwood thought they "might as well finish, in terms of ejaculating."

### iv.

We also acknowledge, for the sake of completeness, another tack that may have appeared to be available to Clark at the time of trial, although not raised by Clark at trial or by the parties in their briefs on this appeal: Clark might have argued that Gallegos did not "knowingly" sexually assault Kendall, because Gallegos *believed* Kendall dead before he raped her.[18] Unlike the theory that Kendall was no longer a

---

[18] Again, the applicable statute provided: "A person commits sexual conduct with a minor by intentionally or *knowingly* engaging in sexual intercourse or oral sexual contact with any person who is under eighteen years of age." Ariz. Rev. Stat. § 13-1405(A) (emphasis added).

"person" after death, which Clark presented to the court in his motion for acquittal, Clark never explicitly articulated to the trial court this distinct *mens rea* theory. The argument, however, was raised before the Arizona Supreme Court on direct appeal as part of a sufficiency of the evidence claim and soundly rejected as resting on an incorrect interpretation of the applicable statute. The Arizona Supreme Court held it contrary to "public policy" to interpret the sexual conduct with a minor statute as permitting a defendant to be acquitted of sexual conduct if he believed his victim to have died prior to the assault, even though she had not. That interpretation, held the Arizona Supreme Court, would "encourage sex offenders to first kill their victims or render them unconscious before committing the sexual offense." *Gallegos I*, 178 Ariz. at 9.

True, the "I thought she was dead" theory was not precluded by appellate precedent at the time of trial. But it is unlikely that Clark's conduct "fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, for failing to make to the jury a novel, extremely unattractive, argument, later definitively rejected as a matter of law on appeal in the same case.

Moreover, and dispositively, any such contention would fail at the *Strickland* prejudice prong, under the Supreme Court's application of that prong in *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). *Lockhart* held that a habeas petitioner cannot demonstrate prejudice under *Strickland* if his counsel failed to raise a legal issue viable at the time of trial but subsequently definitively repudiated. Failure of counsel to make an argument later deemed non-meritorious, *Lockhart* ruled, "does not deprive the defendant of any substantive or procedural right to which the law entitles him,"

and so does not render "the result of the trial unreliable or the proceeding fundamentally unfair." *Id*. at 372. *See also id.* at 369–70 ("To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him."). Given *Lockhart* and the State Supreme Court's ruling on appeal in Gallegos's case concerning the *mens rea* for sexual conduct with a minor, Clark's failure to advance the "I thought she was dead" *mens rea* theory could not possibly be constitutionally prejudicial.

In sum, it would have been reasonable, had the state court expressly addressed the issue, for it to conclude that Clark's failure to explicate a coherent theory to the jury against first-degree murder was driven by the set of bad choices he faced and so not constitutionally deficient. There is a "broad range of legitimate defense strategy" at the closing argument stage; "which issues to sharpen and how best to clarify them are questions with many reasonable answers." *See Gentry*, 54 U.S. at 6. "When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." *Id*. at 8. Given the inherently disturbing nature of the technical theory Clark adopted, for lack of an available alternative, to defend against the felony murder charge, as well as its counter-intuitive nature, it was reasonable to tailor the defense as an argument to the court in the form of a motion for acquittal, and, when the motion was denied and closing arguments remained, not press the theory to the jury.

### 2. *Other Guilt Phase Ineffective Assistance Claims.*

#### i.

Before addressing whether the state court was objectively unreasonable in concluding that no prejudice resulted from the other conduct Gallegos purports was constitutionally deficient, we address whether the state court reasonably determined Clark's conduct to be not so egregious as to warrant a presumption of prejudice under *United States v. Cronic*, 466 U.S. 648 (1984). It did.

"*Cronic* recognized a narrow exception" to *Strickland*'s requirement that a petitioner must demonstrate prejudice, and "instructed that a presumption of prejudice would be in order in 'circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.'" *Florida v. Nixon*, 543 U.S. 175, 190 (2004) (quoting *Cronic*, 466 U.S. at 658). The *Cronic* exception "applies when the attorney's failure to oppose the prosecution goes to the proceeding as a whole—not when the failure occurs only at specific points in the trial." *United States v. Thomas*, 417 F.3d 1053, 1057 (9th Cir. 2005) (citing *Bell v. Cone*, 535 U.S. 685, 697 (2002)); *Hovey*, 458 F.3d at 906–07.

Assuming, without deciding, that Clark's conduct was at times constitutionally deficient in respects other than those already discussed, he did not fail entirely to advocate for Gallegos. Before trial, he moved to suppress Gallegos's confessions as involuntary. Although the arguments were unsuccessful, he presented reasoned arguments in favor of that position at a suppression hearing. Clark also developed significant factual evidence favorable to Gallegos at trial. While cross-examining Detective Saldate, for example, Clark

elicited evidence that: (1) Gallegos never meant to kill Kendall; (2) prior to the assault, Gallegos planned only to fondle Kendall, not rape her; (3) Gallegos believed Kendall was dead prior to the sexual assault; (4) Smallwood was a major participant in the crime; (5) Gallegos expressed remorse for his involvement soon after the crime; and (6) the detective believed Gallegos had told him the truth during his confession. Clark elicited from Gallegos testimony confirming Saldate's accounts, as well as evidence that Gallegos was quite intoxicated on the day of the crime. Clark also moved twice, albeit unsuccessfully, for acquittal on the sexual conduct with a minor charge.

Moreover, as we have explained, although Clark conceded that Gallegos should be convicted, he did not concede that his client was guilty of first-degree murder, and acknowledging that Gallegos was responsible for the death could reasonably have been a strategic maneuver. *See Hovey*, 458 F.3d at 907 (holding *Cronic* not applicable where "counsel conceded his client's guilt to protect his own credibility and avoid conviction on other charges"); *Thomas*, 417 F.3d at 1058 (declining to presume prejudice where the defendant was tried on multiple counts, and counsel conceded certain points that were "for all practical purposes, incontestible," because he "believed that doing so would enhance his credibility on counts where the evidence was somewhat less clear and the penalties significantly greater"); *Anderson*, 232 F.3d at 1087–90 (finding *Cronic* inapplicable where trial counsel conceded that defendant murdered the victim but asked the jury to convict him of first-degree murder rather than felony murder in order to avoid eligibility for the death penalty).

Thus, the state court reasonably determined that Clark's conduct did not constitute abandonment, and that *Strickland*, not *Cronic*, therefore applies to the question of prejudice.

**ii.**

As already explained, the crux of Gallegos's case turned on the first-degree felony murder charge. The prosecutor recognized in closing argument that establishing premeditation was more difficult than proving felony murder, and he focused much of his argument on that charge. To establish prejudice, then, Gallegos must show there is a reasonable probability that, absent Clark's remaining purportedly unprofessional errors—namely, that he unnecessarily vilified Gallegos, inadequately developed his technical theory factually, and failed adequately to prepare for cross-examination of Dr. Bolduc—he would not have been convicted of first-degree felony murder.

It was not unreasonable for the state court to conclude that Gallegos was not able to do so. On the facts developed at trial, convincing the court or jury that Gallegos was not guilty of the predicate felonies supporting first-degree felony murder—sexual conduct with a minor or attempted sexual conduct with a minor—would have been an exceedingly difficult task for even the most skilled attorney. Clark's inability to avoid a conviction of a predicate offense was unrelated to any allegedly deficient conduct.

As we have explained, Dr. Bolduc, the *only* medical expert to testify at trial, expressed his opinion that the assault began before Kendall died, even if it continued after her death. After consulting with a medical expert, Clark was unable to obtain anyone who could contradict Dr. Bolduc's

position. Even if Clark could have done more to prepare for his cross-examination of Dr. Bolduc or to develop his technical defense, the state court was not unreasonable to hold that it would have made no difference. In his state post-conviction proceedings, Gallegos did not adduce *any* expert testimony suggesting the sexual assault could have occurred only after Kendall died, nor did he present any evidence otherwise undermining Dr. Bolduc's opinions. There is therefore no factual basis whatsoever for concluding that further preparation or investigation would have made any difference. Gallegos's speculative assertions that more consultation with an expert could somehow have aided Clark in preparing his defense or in cross-examining Dr. Bolduc are unpersuasive and insufficient to establish prejudice. *See Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (acknowledging that conjecture that a favorable expert might have been found cannot establish prejudice (citing *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997)).

Because the only expert evidence introduced at trial cut squarely against Clark's defense to the felony murder charge, it was reasonable to conclude that any amount of unnecessary vilification, as Gallegos purports occurred, could not have affected the outcome of the trial. Gallegos's conviction of sexual conduct with a minor rested on his own confession that he raped Kendall, introduced at trial through Detective Saldate and Gallegos and confirmed by DNA evidence, not on the jury's possibly negative views of Gallegos.

At most, it might be the case that Clark's harsh treatment of his client decreased Gallegos's chances of avoiding a conviction of premeditated murder. But absent the jury improperly ignoring the charge of felony murder, Gallegos would have nonetheless faced the death penalty at sentencing

even if no juror found him guilty of premeditated murder. That the jury might have irrationally ignored the felony murder alternative is insufficient to establish prejudice, because, with regard to prejudice, we must "exclude the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like." *Strickland*, 466 U.S. at 695.

Thus, even assuming Clark was constitutionally deficient for vilifying Gallegos or insufficiently investigating the medical evidence, and recognizing that "'prejudice may result from the cumulative impact of multiple deficiencies,'" *Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005) (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978) (en banc)), we cannot say that the state court was "objectively unreasonable" to conclude Gallegos failed to show a "substantial . . . likelihood of a different result" had Clark not committed any constitutional errors in his defense.[19] *Pinholster*, 131 S. Ct. at 1403 (citation and quotation marks omitted); *see Allen v. Woodford*, 395 F.3d 979, 999 (9th Cir. 2005) (denying claims that counsel was ineffective because the petitioner could not establish prejudice "in light of the overwhelming evidence of guilt").

Finally, it would not have been unreasonable for the state court to hold that any deficiencies committed by Clark during the guilt phase did not prejudice Gallegos at the penalty stage. First, the state court found as an aggravating factor that

---

[19] We note that in the extremely unlikely event that Clark had created a reasonable doubt as to the predicate felony of sexual conduct with a minor, he would nonetheless still have had to defend against *attempted* sexual conduct with a minor, further confirming our conclusion that it was reasonable to conclude Gallegos was not prejudiced by the purportedly deficient conduct.

Gallegos was an adult at the time of the offense and that Kendall was under fifteen years of age. Nothing Clark did, of course, could have affected that determination.

Nor is there a substantial probability Clark's purported failings affected the other aggravating factor—that Gallegos committed the offense in an especially heinous, cruel, or depraved manner. Given the circumstances, if Clark's harsh treatment of Gallegos was constitutionally deficient, any possible negative consequences pale in comparison to the simple, unrefuted circumstance that Gallegos, while a guest in her family's home, raped an unconscious young girl whom, he maintained, he thought was dead. In fact, the very substance of Clark's chosen theory carried with it a virtually guaranteed finding that Gallegos committed the murder in a depraved manner. *See Gallegos I*, 178 Ariz. at 15 (noting that an "act of necrophilia 'without question' constitute[s] the infliction of gratuitous violence on [a] victim," thereby establishing depravity (quoting *State v. Brewer*, 170 Ariz. 486, 502 (1992)).

Moreover, while Gallegos is correct that the sentencing court relied on some information that can be traced back to Clark's purportedly deficient performance—for instance, the trial court noted that Kendall "flailed her arms" as she awoke, evidence introduced only through Gallegos's testimony—the bulk of the circumstances relied on by the state court was not related to Clark's performance. For one, the sentencing court observed that Kendall's body was bruised and battered. Even accepting Gallegos's contention that Clark was deficient for failing to undermine the testimony regarding the timing of Kendall's anal trauma, Gallegos does not argue there is anything Clark could have done to refute that Kendall's body

exhibited *other* injuries. Those injuries, moreover, have nothing to do with whether Clark vilified his client.

The sentencing court also relied on the fact that Kendall was helpless, noting she weighed only 57 pounds and was asleep at the time of the attack, and that the crime was "senseless because Kendall loved and trusted" Gallegos. Again, Gallegos makes no contentions that Clark's performance could have influenced those findings.

In sum, even if Clark's purportedly deficient conduct contributed somewhat to the state court's sentencing determinations, we cannot say it was objectively unreasonable to conclude Gallegos's sentence would likely remain unaffected absent any errors. *Pinholster*, 131 S. Ct. at 1410 (quoting *Richter*, 131 S. Ct. at 792).

## B. The Penalty Phase

We also reject Gallegos's claims that counsel at sentencing were ineffective for failing fully to prepare and present mitigating evidence concerning his mental health and personal history.[20]

---

[20] Gallegos did not procedurally default this claim for the same reason his claims regarding Clark's development and preparation of medical evidence are not procedurally defaulted: Gallegos argued in his supplemental petition for post-conviction relief that he was denied effective assistance of counsel because his mental health and personal history were insufficiently investigated and presented at sentencing. Gallegos renewed that claim in his petition for review to the Arizona Supreme Court, and included a copy of his supplemental petition for post-conviction relief in the appendix to his state supreme court petition, thereby adequately presenting his claims. *See Scott*, 567 F.3d at 582; *see also supra* note 15.

The state post-conviction court adjudicated Gallegos's claim on the merits, so he must "overcome the limitation of § 2254(d)(1) on the record that was before th[e] state court." *Pinholster*, 131 S. Ct. at 1400. Moreover, because the state court summarily denied Gallegos's penalty phase ineffective assistance claims, we "must determine what arguments or theories . . . could have supporte[d] the state court's decision; and then [we] must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." *Id*. at 1402 (quoting *Richter*, 131 S. Ct. at 786).

Gallegos has the burden of showing a reasonable probability that, but for counsel's deficient performance, the death sentence would not have been imposed. *See Wong v. Belmontes*, 130 S. Ct. 383, 386 (2009). We hold that the state court could reasonably have determined that he was not prejudiced at the penalty phase, and so do not address whether his representation was deficient. *See Bible*, 571 F.3d at 870 (quoting *Strickland*, 466 U.S. at 697).

The state post-conviction court held an evidentiary hearing, affording Gallegos the chance to present evidence supporting his claims. Gallegos, however, adduced no additional mitigating evidence, nor did he offer evidence to undermine the aggravating circumstances found by the state court. The sentencing profile presented to the state post-conviction court—in fact, to the very judge who had previously sentenced Gallegos to death—was identical to the profile at the time of resentencing. Under these circumstances, and because Gallegos's claim was adjudicated on the merits, we are "limited to the record that was before the state court." *Pinholster*, 131 S. Ct. at 1398. Without any

additional evidence before the state post-conviction court, it cannot have been "unreasonable for [that court] to conclude that [Gallegos] had failed to show a 'substantial' likelihood of a different sentence." *Pinholster*, 131 S. Ct. at 1410 (quoting *Richter*, 131 S. Ct. at 792); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("[W]e [must] reweigh the evidence in aggravation against the totality of available mitigating evidence.").

Moreover, the types of evidence Gallegos now argues could have been augmented had counsel performed adequately were all presented to the sentencing courts in some detail. *See Bobby v. Van Hook*, 130 S. Ct. 13, 19 (2009) (confirming that proposed new evidence would have "added nothing of value"). For instance, Gallegos maintains counsel should have more fully documented his history of drug and alcohol abuse. Such evidence, however, was developed at length during his sentencing hearings. Gallegos's sister, for example, noted that he abused alcohol and used marijuana and "coke or crystal." Several of his friends testified that he drank heavily and used marijuana, mushrooms, and acid. And Gallegos himself explained that he started drinking around age thirteen, starting using marijuana in sixth grade, and used methamphetamine in high school. That testimony was confirmed by Dr. Shaw's report, introduced at the second sentencing hearing, in which he explained that Gallegos was drinking beer and "smoking marijuana almost daily," by the ninth grade, and opined that "there is no question that [Gallegos] is an alcoholic." The sentencing court acknowledged Gallegos's history of alcohol and drug use and weighed it as a non-statutory mitigating circumstance. On appeal, the Arizona Supreme Court agreed the history of substance abuse should have been afforded "little, if any, weight," in light of state law specifying that the failure to

seek treatment for substance abuse reduces its mitigating weight. *Gallegos II*, 185 Ariz. at 345 (citing *State v. King*, 180 Ariz. 268, 288 (1994)); *Gallegos I*, 178 Ariz. at 18. Gallegos makes no argument that more from his counsel would have undermined that conclusion.

We are similarly unpersuaded that additional evidence of Gallegos's tendency to be a "follower," incapable of standing up to Smallwood, would have made a difference to Gallegos's sentence, because a substantial amount of such evidence was developed at his resentencing hearing. Gallegos's probation officer, for instance, testified that Gallegos was "very susceptible" to peer pressure. Gallegos's mother agreed that Smallwood exerted influence over Gallegos, and that Gallegos "followed" Smallwood. Gallegos's sister, niece, and several of his friends provided similar accounts of Smallwood's destructive sway over Gallegos. The sentencing court found that evidence unpersuasive, stating there was "no reliable corroborating evidence" that Smallwood was involved. Again, additional evidence that Gallegos was excessively influenced by Smallwood would not have affected the court's determination.

Nor was Gallegos prejudiced by counsel's failure to present evidence that he had a learning disability and was placed in special education classes. Gallegos's presentence report noted that he had been "in special education classes throughout his education career." The juvenile probation report, attached to the presentence report, confirmed he had a learning disability. Gallegos himself also testified to his placement in special education classes. Consistent with that evidence, the sentencing court acknowledged Gallegos's

"documented learning disability," but gave it little weight as there was no evidence he was "mentally deficient."

In sum, any evidence Gallegos maintained could have been introduced at sentencing would have been cumulative of evidence already presented in detail at the sentencing hearings. The state court's application of *Strickland*, therefore, was not "objectively unreasonable," as there exists no "reasonable probability" that the additional information Gallegos suggests should have been uncovered and presented "could have resulted in a different outcome of the penalty phase of the trial." *Brown*, 503 F.3d at 1014; *see also Bible*, 571 F.3d at 872.

## CONCLUSION

Had Gallegos been sentenced by a jury of his peers, as would now be his constitutional right, *see Ring*, 536 U.S. at 609, his sentence may very well have been different. To be sure, his crime was an unspeakable one. At the same time, it is nothing short of remarkable that the two detectives in charge of his case both testified *against* imposition of the death penalty, especially considering that neither officer had ever so recommended. Perhaps a jury would not unanimously have sentenced Gallegos to die after hearing that the two officers most familiar with his case found such a punishment unwarranted. *See* Scott E. Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 Va. L. Rev. 1109, 1146 & n.91 (1997) (concluding that witnesses "perceived to be testifying counter to their usual inclinations or who would not normally be seen as supportive of the defendant" are "[e]specially effective," and discussing the testimony of a prison employee whose mitigating "testimony was later instrumental in

swaying the jurors holding out for death to agree instead to a life sentence"). On top of that, Gallegos was barely eighteen years old at the time of the crime and had no serious criminal background. A jury could have viewed the horrendous offense as aberrational and declined to impose the death penalty.

The sentencing judge was adamant. Indeed, he proclaimed that "even if the Arizona Supreme Court told this Court to weigh the alcohol and drug history and impairment ten times, this Court would still find that each aggravating circumstance standing alone would outweigh all collective mitigation." Some jurors—at least one—might well have taken a different approach. There is really no way to know. Such diversity of views is one of the bedrock values underlying our jury system, facilitating sentencing that "express[es] the conscience of the community on the ultimate question of life or death." *Witherspoon v. Illinois*, 391 U.S. 510, 519 (1968). Nonetheless, and even though "[t]he right to jury trial is fundamental to our system of criminal procedure," *Summerlin*, 542 U.S. at 358, that Gallegos was sentenced by a method later held unconstitutional is, under *Summerlin*, not a ground for granting relief, and he advances no such claim. *Id*. (holding that the rule announced in *Ring* does not apply retroactively to cases already final on direct review).

For the reasons given above and applying the highly deferential AEDPA standard, Gallegos is not entitled to habeas relief on the claims covered in this opinion.

**AFFIRMED in part and REMANDED for further proceedings consistent with the concurrently filed order.**