FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| TRACY DEARL CAIN, *Petitioner-Appellant*, | No. 13-99008 |
| v. | D.C. No. 2:96-cv-02584-ABC |
| KEVIN CHAPPELL, Warden, *Respondent-Appellee.* | OPINION |

Appeal from the United States District Court
for the Central District of California
Audrey B. Collins, District Judge, Presiding

Argued and Submitted August 2, 2016
Pasadena, California

Filed September 13, 2017

Before: Diarmuid F. O'Scannlain, Johnnie B. Rawlinson,
and Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Rawlinson

## SUMMARY[*]

### Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of a habeas corpus petition in a death penalty case.

The petitioner was convicted after a jury trial and sentenced to death for two counts of first-degree murder, burglary, and robbery. Distinguishing *Gautt v. Lewis*, 489 F.3d 993 (9th Cir. 2007), the panel held that the petitioner was not denied procedural due process through inadequate notice of an attempted rape special circumstance, and his constitutional rights were not violated when the prosecutor presented this special circumstance to the jury.

The panel expanded the certificate of appealability to include additional claims but held that these claims lacked merit. The panel held that the petitioner did not establish guilt-phase ineffective assistance of counsel in his attorney's concession of guilt on the burglary counts, failure to object to the attempted rape special circumstance, or failure to investigate and present voluntary intoxication and mental health defenses.

The panel held that the petitioner did not establish penalty-phase ineffective assistance in counsel's failure to investigate and present mitigating evidence based on the petitioner's substance abuse, neurological and psychological problems, and family background. The panel concluded that

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the petitioner did not establish an Eighth Amendment claim based on intellectual disability under *Atkins v. Virginia*.

---

## COUNSEL

Jonathan C. Aminoff (argued) and Mark R. Drozdowski, Deputy Federal Public Defenders; Hilary Potashner, Federal Public Defender; Office of the Federal Public Defender, Los Angeles, California; for Petitioner-Appellant.

Kim Aarons (argued) and A. Scott Hayward, Deputy Attorneys General; Lance E. Winters, Senior Assistant Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Office of the Attorney General, Los Angeles, California; for Respondent-Appellee.

---

## OPINION

RAWLINSON, Circuit Judge:

In this death penalty case, Petitioner Tracy Cain (Cain) challenges the district court's denial of his federal habeas petition. Cain was convicted and sentenced to death for the murder of a couple, William and Modena Galloway, who resided in a home next to Cain's father. The district court denied Cain's habeas petition, but granted a certificate of appealability (COA) on Cain's claim that he did not receive adequate notice of the attempted rape special circumstance. We affirm the district court's denial of Cain's habeas petition.

## I. *BACKGROUND*

In a criminal complaint, Cain was charged with the first-degree murders of the Galloways. The complaint further alleged special circumstances premised on multiple murder, rape or attempted rape, robbery or attempted robbery, and burglary in connection with Mrs. Galloway's murder. With respect to the rape special circumstance, Special Allegation No. 4 provided:

> It is further alleged that the murder of Modena Shores Galloway was committed by defendant, Tracy Dearl Cain, while the defendant was engaged in the commission or attempted commission of the crime of rape, in violation of Penal Code section 261, within the meaning of Penal Code section 190.2(a)(17).

The complaint also alleged special circumstances based on multiple murder, burglary, and robbery or attempted robbery associated with Mr. Galloway's murder. Cain was also separately charged with the offenses of rape, burglary, and robbery.

A second amended information alleged the same basic offenses and special circumstances, albeit with some additional details. Unlike the original criminal complaint, the amended information did not specifically allege attempted rape as a special circumstance. Instead, Special Allegation 6 stated:

> It is further alleged that the murder of Modena Shores Galloway was committed by

defendant, Tracy D. Cain, while the defendant was engaged in the commission of rape in violation of Penal Code Section 261, within the meaning of Penal Code Section 190.2(a)(17).

Cain did not raise any pre-trial objections to the allegations in the amended information addressing the attempted rape special circumstance. *See People v. Cain*, 892 P.2d 1224, 1248 (Cal. 1995) (In Bank) (explaining that, after the prosecution's rebuttal, "the *trial court raised the issue* of whether the information had provided defendant with sufficient notice of the attempted rape basis of the special circumstance") (emphasis added).

The evidence at trial established that the Galloways lived next door to Cain's father. *See id.* at 1233. Mr. Galloway, who was sixty-three years old, suffered from poor health and a back injury, and "had a habit of keeping large amounts of cash in his house." *Id.*

During the relevant period, Cain's father went on a trip, leaving Cain and his younger brother, Val, at the residence. *See id.* at 1234. On the night of the Galloways' murders, Cain and Val had a party at their father's house. *See id.* Ulysses Anthony Mendoza (Mendoza), Floyd Clements (Clements), David Cerda (Cerda), Rick Albis (Albis), and Kevin Walker (Walker) attended the party. *See id.*

Mendoza testified that Cain was agitated and upset during the party. Cain threatened Mendoza and others when he was unable to find ten dollars that was missing, and kicked a hole in a door because he was angry with his brother.

Mendoza related that, at approximately 11:00 pm, Cain asked Mendoza to accompany him to the 7-Eleven to purchase beer. As they were walking to the 7-Eleven, Cain asked Mendoza if he "wanted to help him burglarize or rob that house next door to his house." According to Mendoza, Cain stated that he wanted to burglarize the residence "so he can get thousands." Mendoza refused because he "[d]idn't have the nerve."

At the 7-Eleven, Mendoza and Cain met Richard Willis (Willis) and Willis' friend, Shawn. Cain asked them if they had any cocaine. While riding in Shawn's vehicle, Cain made a "strangling motion" to Mendoza, after which Mendoza asked to be dropped off for fear that "something foolish would happen." Mendoza returned to the Cain residence.

When Cain arrived at the residence, he "called [Mendoza] a pussy . . . [b]ecause [Mendoza] wouldn't help him." Mendoza then saw Cain and Cerda leave the residence. Cerda returned to the Cain residence alone. At some point, Val asked Cerda to check on his brother. After a few seconds or minutes, Cerda returned without Cain. When Cain eventually returned to the residence, he "had blood on his hat, inner part of his hat, on his cheek, on his right foot, [and] on his pant leg." Cain stated that "he had thousands" and Mendoza recalled that Cain had "a lot of money in his left palm." Cain also remarked that he "blipped somebody."

The next morning, Mendoza observed Cain sleeping in a recliner in the living room. Mendoza noticed that Cain had $500 next to him on a table. Mendoza also observed that Cain's "knuckles were torn up." Later in the day, Mendoza and Cain went shopping. Cain paid cash for new basketball

shoes, a hat, and a car stereo.  According to Mendoza, Val asked Cain if he had killed someone and Cain responded, "That's on them. . . ."

The following day, Mendoza attended a barbecue at the Cain residence.  During the barbecue, Cain threatened Mendoza if he refused to let Cain use his truck.  Mendoza noticed that Cain had placed a box in the truck containing rags, sticks, and wires.  Cain subsequently disposed of the box near the beach.

Dr. Frederick Lovell, Chief Medical Examiner for Ventura County, performed an autopsy on Mr. Galloway's body.  Dr. Lovell observed numerous bruises on Mr. Galloway's body and "hemorrhage over the entire left side of [his] head from front to back on bone, and . . . hemorrhage in and around the brain underneath."  Dr. Lovell stated that there was a minimum of thirteen separate blows on Mr. Galloway's body and that Mr. Galloway died from trauma to his brain.[1]

Dr. Ronald O'Halloran, Assistant Medical Examiner for Ventura County, examined Mrs. Galloway's body.  Dr. O'Halloran observed "multiple injuries on [Mrs. Galloway's] face."  Mrs. Galloway suffered "a baselar skull fracture" and "a hemorrhage in the space around the brain."  Dr. O'Halloran determined that Mrs. Galloway died from "traumatic head injuries."

---

[1] The evidence reflected that "[a] broken child's rocking chair, splattered with blood and missing a rocker and an armrest support, was found next to Mr. Galloway's body in the hallway."  *Cain*, 892 P.2d at 1236.

Dr. O'Halloran observed Mrs. Galloway "lying on her back on the bed . . . with her feet and legs extending over the side of the bed." According to Dr. O'Halloran, Mrs. Galloway's "legs were spread wide apart, exposing her genital area; and she was nude from the waist down." There was also "a pillow lying over her head" and "blood splatters on the wall." "There was moist fluid coming out of her vaginal area, and . . . a streak of brownish-red material that appeared to be blood coming from or coming from close to her vaginal area."

During Mrs. Galloway's autopsy, Dr. O'Halloran "surgically removed the vagina and examined it" for injuries. Dr. O'Halloran discovered "a one centimeter long tear . . . inside the vaginal opening. . . ." Due to the lack of hemorrhage, Dr. O'Halloran opined that he may have caused the tear during his examination. Dr. O'Halloran also noted that the absence of injuries did not preclude a finding that Mrs. Galloway was raped.

Edwin Jones (Jones), a criminalist, testified as a hair expert. Jones determined that fifteen hairs found in Mrs. Galloway's panties, pajama bottom, slipper socks, and pajama top were microscopically similar to Cain's hair samples. Jones eliminated Mendoza, Cerda, and Clements as sources of the pubic hairs found on Mrs. Galloway's body. Jones also performed a chemical analysis of enzymes in the hair samples and determined that he could not eliminate Cain.

Dr. Bruce Woodling testified as an expert on sexual assault. Dr. Woodling related that he had examined approximately 2,000 sexual assault victims. After examining Mrs. Galloway, Dr. Woodling concluded that Dr. O'Hallaron's testimony that he may have caused the vaginal

tear was not a "likely explanation." Dr. Woodling related that he had never observed a similar tear during removal and examination of the vagina in the rape cases in which he participated. Dr. Woodling opined that the laceration was "a classic injury of a forced penile-type penetration . . ."

Detective Billy Tatum of the Oxnard Police Department testified that he investigated the Galloway homicides. Detective Tatum spoke with Mendoza and did not observe any injuries on Mendoza's hands. Detective Tatum subsequently obtained an arrest warrant for Cain and interviewed Cain at the police station. The tape recorded interview was played to the jury.

During the taped interview, Cain initially stated that he remained at his residence on the night of the Galloways' murders, except to go to the store, and "stayed at home" the following day. Cain related that he found out about the Galloways' murders on the following Monday, when he returned home from work. Cain explained that the bruise on his shoulder was from his girlfriend and the cuts on his fingers were from playing with his dog.

Cain eventually admitted that he went into the Galloways' residence, but denied committing the murders. After inquiring if the police had any evidence that Cain "killed them," Cain admitted that he and other individuals entered the residence on Saturday to "wipe[ ] away the fingerprints." Cain also eventually acknowledged that he was in the Galloways' residence during the murders, and he asserted that Albis placed a pillow cover over Mrs. Galloway's face. Cain mentioned that Cerda and Mendoza hit Mr. Galloway and Mendoza struck Mr. Galloway with a chair. According to Cain, his fingerprints may have been on the chair because he

"picked it up and . . . moved it." Cain conveyed that he did not know who raped Mrs. Galloway, but that Albis struck her in the hallway and placed her on the bed.

Detective Tatum testified that there was a malfunction in the audio tape during the interview, and the tape "just stopped playing . . . on Side 1." During the malfunction, Cain admitted to stealing $500 from the Galloways' residence.

Prior to jury deliberations, the trial court expressed concern about the attempted rape special circumstance. Specifically, the trial court observed that the information did not specifically charge attempted rape, although the information charged attempted robbery. Cain's counsel responded:

> But to be quite candid about it, I've read Section 190.2 numerous times. I'm aware it says commission or attempted commission. I can't in good conscience say that I am surprised at this late date. I think it's clear the entire thrust of the testimony from all the doctors was an actual rape . . . I'm aware of the section. I'm aware how it is plead, and I'm aware of these jury instructions. And I'm not going to sit here and pretend that I'm surprised and I'm going to holler foul at the D.A. at this late time. . . . I was aware and I heard [the prosecutor] and I could have objected but I didn't because I think that he's entitled to argue under Section 190.2 commission or attempted commission. . . . But I don't think Tracy Cain and the defense is [sic] prejudiced. . . .

Based on counsel's statement, the trial court did not pursue the issue further.

The trial court instructed the jury that it could find the special circumstance if "the murder was committed while the defendant was engaged in or was an accomplice in the commission or attempted commission of a burglary[,] a robbery or a rape" and that "the defendant intended to kill a human being or intended to aid another in the killing of a human being[.]" The trial court also instructed the jury that "the special circumstance referred to in these instructions is not established if the burglary, robbery or rape was merely incidental to the commission of the murder."

The jury found Cain guilty of first-degree murder, burglary, and robbery, but acquitted Cain on the rape charge. The jury determined that Cain murdered Mr. Galloway during the commission or attempted commission of burglary and robbery. The jury also concluded that Cain murdered Mrs. Galloway during the commission or attempted commission of rape, burglary, and robbery.

During the penalty phase, Anita Parker (Parker) testified that she was assaulted by Cain. According to Parker, Cain struck her in the head with a tire iron and kicked her during an altercation.

Nicholas Perez (Perez), a juvenile detention officer, related that Cain hit him with his fist as Perez was escorting Cain. According to Perez, his nose was broken and he required six stitches above his left eye.

David Wheat (Wheat), a state prison supervisor, testified on Cain's behalf. Wheat informed the jury that, when Cain

was incarcerated, he was permitted to work on a fence crew, a position reserved for inmates with no discipline problems. In his reports, Wheat rated Cain with the "highest number" available due to Cain's good "work habits."

Reynaldo Duran (Duran), a training specialist with the Arizona State Department of Corrections, supervised a ground crew to which Cain was assigned. Duran reported that Cain was rated highly for his cooperation, effort, and responsibility.

Wilma Cain (Wilma), Cain's stepmother, testified that Cain was one of eleven children and that Cain's mother died during the Jonestown massacre. Wilma described Cain as a "typical boy" growing up. Wilma conveyed that she was shocked that Cain was convicted of the Galloways' murders because "it didn't sound like Tracy[.]" Wilma related that Cain "got along with everybody."

Persey Cain (Persey), Cain's father, also testified that Cain's mother died at Jonestown. Persey described Cain as "a good kid" and a "typical . . . boy" during his youth. Persey was shocked by the crime because "it didn't sound like Tracy Cain[.]" Persey related that Cain had "never been in any kind of problem other than . . . car theft."

In his penalty-phase closing argument, Cain's counsel emphasized that the prosecution never demonstrated that Cain premeditated or planned to murder the Galloways and that there was "no deliberate killing." Defense counsel also argued that Cain was severely impaired due to his drug use before the murders. His counsel maintained that "[w]e know he was intoxicated. Witness after witness came in and testified. . . . He was using crack. . . . [T]he truth is he was

impaired." Cain's counsel contrasted the Galloways' murders with specific cases of brutal, premeditated homicides. He asserted that, in contrast to those cases, Cain was "drug-impaired" and "act[ed] in a rage reaction" without any premeditation. He argued that Cain's mother died when Cain was young; that Cain failed to finish school; and that Cain lacked many advantages described by the prosecution. In addition, defense counsel focused on positive reports Cain received while incarcerated.

Defense counsel emphasized that Mendoza was never arrested and that Cerda did not face the death penalty or "life without parole." Defense counsel remarked that Cain was "the only one that's going to end up in jail for the rest of his life, whether he gets the gas chamber in jail or whether he dies in jail." Cain's counsel argued that life in prison was the proper punishment given the circumstances of life in prison. Finally, Cain's counsel argued that:

> [a]n unplanned, drug-impaired act with no foreseen consequences has cost Tracy Cain his life. But . . . there still is value in his life. He proved it in prison before. He proved it with his prison records, and he can prove it again if you give him the chance.

The jury sentenced Cain to death based on his first-degree murder of Mrs. Galloway and the multiple murder, attempted rape, burglary, and robbery special circumstances. The jury also sentenced Cain to death for the first-degree murder of Mr. Galloway and special circumstances involving robbery and burglary.

On direct appeal, the California Supreme Court affirmed Cain's convictions and sentence. *See Cain*, 892 P.2d at 1276. Relevant to this appeal, the Court rejected Cain's claim that he received inadequate notice of the attempted rape special circumstance. *See id.* at 1248–49. The Court held:

> We find no statutory error in the language used to allege the rape special circumstance. Although consistency in the form of charging special circumstances is preferable, the rape special circumstance as alleged satisfactorily charged defendant and was not misleading. Under the statute, the rape special circumstance specifically includes that the crime was committed during the attempted commission of a rape. The information specifically referred to the statute defining the special circumstance. Under these circumstances, the rape special-circumstance allegation provided the express notice of the charges against defendant required under state law in a capital case.

*Id.* at 1249 (citations and internal quotation marks omitted). The Court emphasized Cain's counsel's acknowledgment that he was not surprised by the prosecution's arguments and the jury instructions premised on attempted rape. *See id.* The Court observed:

> since the information was sufficient to provide the required notice, and defendant's counsel stated defendant was neither surprised nor prejudiced by the argument and instructions relating to attempted rape as the

> basis of the rape special circumstance,
> defendant's constitutional right to notice of
> the charges against him was not
> compromised.

*Id.* (citations omitted). The Court rejected Cain's related arguments that the information was constructively amended to include attempted rape, and that his counsel was ineffective in failing to object to the attempted rape special circumstance. *See id.* at 1249 n.17.

Cain subsequently sought federal habeas relief. In Claim 1(6) of his third amended habeas petition, Cain asserted that he did not receive constitutionally adequate notice of the attempted rape special circumstance and that the prosecution engaged in prosecutorial misconduct when it argued the special circumstance to the jury. In Claim 3(7), Cain contended that his constitutional rights were violated when the state trial court instructed the jury on the attempted rape special circumstance.

The district court denied Cain's claims, but granted a certificate of appealability "as to Claims 1(6) and 3(7) regarding the constitutional adequacy of Petitioner's notice of the attempted rape special circumstance charge."

Cain filed a timely amended notice of appeal.

## II. STANDARDS OF REVIEW

"We review de novo the district court's denial of [Cain's] petition for a writ of habeas corpus and review its factual findings for clear error. . . ." *Smith v. Ryan*, 823 F.3d 1270, 1278 (9th Cir. 2016), *cert. denied*, 137 S. Ct. 1283 (2017)

(citation omitted). Because Cain filed his federal habeas petition after April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) applies. *See Mann v. Ryan*, 828 F.3d 1143, 1151 (9th Cir. 2016) (en banc). Under the AEDPA, habeas relief is warranted if the state court's adjudication of Cain's claims "was contrary to or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254. We may also grant relief if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.*

"An adjudication is contrary to clearly established Supreme Court precedent if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Mann*, 828 F.3d at 1151 (citation, alterations, and internal quotation marks omitted). "It is an unreasonable application of clearly established Supreme Court precedent if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* (citation and internal quotation marks omitted). "An *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* (citation and alteration omitted) (emphases in the original). "The federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* (citation and internal quotation marks omitted). "A state court's adjudication is unreasonable only if the federal habeas court

concludes that no fairminded jurist could conclude that the adjudication was consistent with established Supreme Court precedent. . . ." *Id.* at 1151–52 (citation omitted).

## III.    DISCUSSION

### A. Certified    Issue—Adequate    Notice    of    the Attempted Rape Special Circumstance

Cain contends that habeas relief is warranted because he did not receive adequate notice of the attempted rape special circumstance and the prosecutor improperly relied on an attempted rape special circumstance that was not charged in the information.

The Supreme Court has clearly established that a defendant must receive adequate notice of the charges against him. "No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal. . . ." *Cole v. Arkansas*, 333 U.S. 196, 201 (1948) (citation omitted).[2]

---

[2] Citing *Lopez v. Smith*, 135 S. Ct. 1 (2014), the State contends that Supreme Court precedent has not clearly established the requirement of adequate notice of the specific theory under which a felony-murder special circumstance would be proved. In *Lopez*, the Supreme Court reversed our grant of habeas relief premised on failure to provide adequate notice of an aiding-and-abetting theory at trial. *See id.* at 3. The Supreme Court faulted us for granting relief because the prosecutor focused on another theory at trial, although the defendant previously received notice of potential liability on an aiding-and-abetting theory. *See id.* The Supreme Court observed that it was not disputed that the defendant "received

Relying on *Gautt v. Lewis*, 489 F.3d 993 (9th Cir. 2007), Cain maintains that he was not properly informed of the attempted rape special circumstance in the second amended information. However, Cain's reliance on *Gautt* is entirely misplaced. In *Gautt*, we granted habeas relief because the information failed to inform the petitioner that he was charged with a specific sentencing enhancement that significantly increased his potential sentence. *See id.* at 998. We emphasized that "the pivotal fact" in that case was the complete omission of any mention of the specific statute in the information. *Id.* at 999. We observed that the charged and uncharged conduct were dramatically different in that the charged statute required "only that the defendant personally used a firearm," while the uncharged statute required that "the defendant personally discharged a firearm." *Id.* (emphases and internal quotation marks omitted). Moreover, the charged offense was punishable by a ten-year sentencing enhancement and the uncharged offense was governed by a "twenty-five-year-to-life . . . enhancement." *Id.*

Further compounding the error in *Gautt*, "the trial court confused the two statutes when time came to instruct the jury" and erroneously informed the jury about the additional elements unique to the uncharged offense. *Id.* The parties did not object to the trial court's instruction and the prosecution relied on the instruction in its closing argument. *See id.* at 999 n.5, 1000. Additionally, "[t]he pattern of

adequate notice of the possibility of conviction on an aiding-and-abetting theory." *Id.* Therefore, *Lopez* is distinguishable and does not show that the requirement of adequate notice is not clearly established. However, we need not—and do not—decide whether the requirement of notice of the prosecution's theory of a felony-murder special circumstance is otherwise clearly established, as we conclude that such notice was provided here.

statutory confusion and conflation that began with the trial judge's instructions to the jury repeated itself when the jury completed its verdict form. . . ." *Id.* at 1000. Specifically, the verdict form cited the charged statute, but listed elements unique to the uncharged statute. *See id.* at 1001. Finally, the abstract of judgment "listed . . . the ten-year enhancement . . . as the basis for a sentence enhancement," but "also stated that [the petitioner's] sentence was to be enhanced twenty-five years to life-the applicable enhancement under" the uncharged statute. *Id.*

In concluding that the state appellate court unreasonably determined that the petitioner received adequate notice, we emphasized:

> This is not a situation . . . in which the numerical citation was incorrect but the verbal description of the crime corresponded to the crime of which the defendant was convicted. Nor is this a situation in which citation to one statute necessarily encompassed another lesser-included offense, thus sufficiently putting the defendant on notice of the need to defend against both statutes. . . .

*Id.* at 1007 (citation omitted). We criticized the state appellate court because it "never actually scrutinized the information to see if it contained any factual allegations that would have sufficiently informed [the petitioner]" of the uncharged conduct. *Id.* at 1005. The state appellate court also never explained "how exactly this triumvirate-the evidence, the jury instructions, and the closing argument-provided [the petitioner] with sufficient notice." *Id.* (footnote reference omitted). Additionally, the state appellate court

"did not acknowledge the multiple discrepancies that existed between the information, the jury instructions, the verdict form, and the ultimate sentence." *Id.* at 1006. Based on the state appellate court's "critical oversight," we opined that the petitioner's "constitutional right to be informed of the charges against him was violated by this stark discrepancy between the crime charged and the crime of conviction. . . ." *Id.* at 1008.

Although we eschewed express reliance on other sources, such as trial evidence, jury instructions, and closing arguments, to assess whether the petitioner received adequate notice of the charges, *see id.* at 1008–09, we nonetheless "assume[d]-without deciding-that such sources can be parsed for evidence of notice to the defendant." *Id.* at 1010. Nevertheless, we concluded that, even considering these sources, the petitioner received constitutionally inadequate notice. *See id.* We observed that the trial evidence did not focus on the petitioner's intent as required under the uncharged statute; the jury instructions were muddled and provided minimal indication that the uncharged offense was at issue; and the prosecution's closing argument was too flawed regarding the intent required for the uncharged offense to provide adequate notice of the uncharged offense. *See id.* at 1011–13.

Unlike in *Gautt*, the California Supreme Court in this case did not unreasonably conclude that Cain received constitutionally adequate notice of the attempted rape special circumstance. The second amended information did not explicitly charge Cain with an attempted rape special circumstance, but alleged that Cain "engaged in the commission of rape in violation of Penal Code Section 261, within the meaning of Penal Code Section 190.2(a)(17)."

The provisions of Cal. Penal Code § 190.2(a)(17) in effect at the time of Cain's trial specified that a special circumstance may be based on the defendant's attempted commission of rape:

> The penalty for a defendant found guilty of murder in the first degree shall be death or confinement in state prison for a term of life without the possibility of parole in any case in which one or more of the following special circumstances has been charged and specially found . . . to be true: The murder was committed while the defendant was engaged in or was an accomplice in the commission of, attempted commission of, or the immediate flight after committing or attempting to commit . . . Rape in violation of Section 261.

Cal. Penal Code § 190.2(a)(17)(iii)(West 1987). Thus, the allegations premised on Cal. Penal Code § 190.2(a)(17) sufficiently apprised Cain that the special circumstance explicitly applied to rape and to attempted rape. *See Gautt*, 489 F.3d at 1003–04 (explaining that "the charging document need not contain a citation to the specific statute at issue; the substance of the information, however, must in some appreciable way apprise the defendant of the charges against him so that he may prepare a defense accordingly") (footnote reference omitted). Moreover, as described in *Gautt*, Cain's case is "a situation in which citation to one statute necessarily encompassed another lesser-included offense," thereby providing additional notice to Cain of the attempted rape special circumstance. *Id.* at 1007 (citation omitted); *see also People v. Atkins*, 25 Cal. 4th 76, 88 (2001) (noting that attempted rape is a lesser included offense of rape under

California law).    Importantly, Cain's counsel fully
acknowledged that he was not surprised by the prosecution's
reliance on attempted rape as a special circumstance, and did
not argue that Cain was prejudiced by the prosecution's
reliance on attempted rape as a special circumstance.

The California Supreme Court reasonably concluded that
Cain received adequate notice of the special circumstance.
Thus, Cain is not entitled to habeas relief on his claim that he
failed to receive adequate notice of the special circumstance
or his claim that the prosecutor improperly presented the
special circumstance to the jury.   *Cf. Gautt*, 489 F.3d at
1007.[3]

## B.  Uncertified Claims

"To expand the certificate of appealability, [Cain] must
make a substantial showing of the denial of a constitutional

---

[3] Any error in failing to provide Cain adequate notice of the attempted
rape special circumstance was likely harmless.  *See Gautt*, 489 F.3d at
1016–17 (applying harmless error review).  Cain does not challenge the
jury's verdict that he was death-eligible based on the multiple murder,
burglary, and robbery special circumstances.  Due to the weight of the
aggravating circumstances and the unchallenged special circumstances,
"we are not left with grave doubt about whether the jury's consideration
of the [allegedly] invalid special circumstance[] had a substantial and
injurious effect on the jury's verdict," particularly as "the presentation of
evidence and argument during the penalty phase would not have been
materially different." *Beardslee v. Brown*, 393 F.3d 1032, 1044 (9th Cir.
2004).  The jury independently considered the special circumstances
applicable to Mr. Galloway's murder, which did not implicate the
attempted rape special circumstance. *See Brown v. Sanders*, 546 U.S.
212, 223–25 (2006) (upholding capital sentence against a constitutional
challenge where a California jury considered four special circumstances
findings, two of which were later invalidated).

right, accomplished by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims . . ." *Turner v. McEwen*, 819 F.3d 1171, 1178 n.2 (9th Cir. 2016) (citation and internal quotation marks omitted).  Although we conclude that Cain has met that standard for the claims discussed below, we deny each of the claims on the merits.

### 1.   Guilt-Phase Ineffective Assistance of Counsel

"Ineffective assistance of counsel claims are evaluated according to the familiar standard set forth in *Strickland*."[4] *Mann*, 828 F.3d at 1152.  "To receive relief under this standard, first, the defendant must show that counsel's performance was deficient."  *Id.* (citation, alteration, and internal quotation marks omitted).  "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* (citation omitted).  "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable."  *Id.* (citation omitted). "Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (citation and internal quotation marks omitted).

### a.   Counsel's Concession of Cain's Guilt

Cain contends that he was deprived of effective assistance of counsel because his counsel conceded at trial that Cain had the specific intent to commit burglary.  Cain maintains that

---

[4] *Strickland v. Washington*, 466 U.S. 668 (1984).

his counsel pursued an ill-informed strategy in admitting Cain's guilt on the burglary counts because Cain never confessed to burglary.

The California Supreme Court denied this claim on direct review. *See Cain*, 892 P.2d at 1241. The Court concluded:

> Defendant also appears to argue his counsel's concessions were an incompetent tactical choice. We disagree. Defendant admitted to the police on tape he was inside the victims' residence when they were murdered and he entered the residence with the intent to steal money. His taped statement was played to the jury. Defendant's admission that he entered the residence for the purpose of stealing money proved his specific intent to commit burglary. Under the felony-murder rule, his commission of burglary, together with the killing of the victims in the commission of the burglary, made him liable for murder. Under these circumstances, we cannot conclude counsel was ineffective for candidly admitting defendant's guilt on these counts while vigorously arguing against defendant's guilt of the special circumstances.

*Id.* (citations omitted).

"In assessing adequacy of representation, we are required not simply to give the attorneys the benefit of the doubt, but to affirmatively entertain the range of possible reasons defense counsel may have had for proceeding as he did. . . ." *Gallegos v. Ryan*, 820 F.3d 1013, 1030 (9th Cir. 2016) (citing

*Cullen v. Pinholster*, 131 S. Ct. 1388, 1407 (2011) (alterations, and internal quotation marks omitted). At trial, Cain's counsel "was confronted with an exceedingly difficult task in formulating a defense" given Cain's admissions during his taped confession and the evidence against him. *Id.* at 1018. We have recognized that:

> As a strategic matter, disputing [the petitioner's] involvement in the crime would have been unpersuasive given the evidence, and [counsel's] acknowledgment of his client's guilt in the killing could reasonably have been intended to establish credibility with the jury in the face of horrendous facts. . . .

*Id.* at 1027 (citations omitted). In light of the evidence against Cain and his admissions of guilt, Cain "suggests no alternate theory, let alone one more likely to succeed than the one chosen" by his counsel. *Id.* at 1029. Indeed, the inability of Cain's counsel "to avoid a conviction of a predicate offense was unrelated to any allegedly deficient conduct" and convincing the jury that Cain was not guilty of felony murder "would have been an exceedingly difficult task for even the most skilled attorney." *Id.* at 1035. Rather, Cain's counsel focused on Cain's defense theory that, although involved in the crimes, he never participated in the actual killings of the Galloways and lacked the intent to kill required for the jury to find any of the alleged special circumstances to be true. Relying on this theory, Cain's counsel could have made a reasonable strategic calculation not to contest the strong evidence of Cain's guilt for felony murder, but instead, to focus on avoiding a capital sentence for Cain. *See Florida v. Nixon*, 543 U.S. 175, 190–92 (2004). Thus, "[a]bsent any

defense that could have promised a greater chance of success, we cannot conclude that [Cain's counsel] was deficient for choosing the one he did. The choice to pursue a bad strategy makes no comment on an attorney's judgment where no better choice exists." *Gallegos*, 820 F.3d at 1029 (citation and internal quotation marks omitted).

Cain also asserts that the California Supreme Court's determination that Cain admitted entering the Galloways' residence with intent to commit burglary was unreasonable. According to Cain, he never admitted that he entered the Galloways' home to steal money. However, even if the California Supreme Court was wrong that the tape recordings of Cain's police interview include an explicit admission that he went into the Galloway's home with an intent to steal on the night of the killings, there remains sufficient evidence for the court to have concluded that Cain harbored such an intent. Indeed, on the tape Cain admitted that he did want to steal from the Galloways the next morning, and testimony was offered that he did (and did intend to) steal from them the night before as well. "[Section] 2254(d)(2) requires that we accord the state trial court substantial deference." *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015) "If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the [state] court's determination. . . ." *Id.* (citation, alteration, and internal quotation marks omitted). The record reflects that Cain admitted to being inside the Galloways' residence during the murders. The trial testimony also reflected that Cain suggested to Mendoza that they burglarize the Galloway residence so that he could "get thousands," and that he possessed a large sum of money after the murders. The state court's denial of this claim was not contrary to, nor did it involve an unreasonable interpretation of *Strickland*. *See*

*Strickland*, 466 U.S. at 690 (clarifying that counsel's tactical decisions are "virtually unchallengeable").

### b. Failure To Object To Attempted Rape Special Circumstance

Cain contends that his counsel was ineffective because he did not object to the attempted rape special circumstance.

Rejecting Cain's claim on direct review, the California Supreme Court concluded:

> We doubt, moreover, whether the principal error alleged, i.e., counsel's failure to claim surprise and prejudice where there was none, could be considered constitutionally deficient performance even if prejudicial. Effective assistance does not require counsel to refrain from frankness and honesty in his or her dealings with the court. . . .

*Cain*, 892 P.2d at 1249 n.17 (citations and internal quotation marks omitted). The district court ruled that the state court "was not unreasonable in holding that [Cain] had adequate notice" of the attempted rape special circumstance, or in finding counsel's performance to be adequate. We agree because counsel's performance did not fall below an objective standard of reasonableness in acknowledging the portent of the state statutory provisions. *See United States v. Cronic*, 466 U.S. 648, 656 n.19 (1984) (observing that "the Sixth Amendment does not require that counsel do what is impossible or unethical. If there is no bona fide defense to the charge, counsel cannot create one and may disserve the

interests of his client by attempting a useless charade.")
(citation omitted).

### c. Failure To Investigate and Present Voluntary Intoxication and Mental Health Defenses

Cain describes his counsel as ineffective because he failed to investigate and present a voluntary intoxication defense during the guilt phase of the trial, premised on Cain's cocaine use and neurological deficits.

On direct review, the California Supreme Court observed:

> Defendant further contends trial counsel did not present even a minimally effective argument on the undisputed use of alcohol and drugs on the night in question. Counsel did briefly argue there was no intent to kill because defendant was obviously under the influence of alcohol and drugs. Belaboring this point would have risked appearing to concede defendant was the killer, which would have conflicted with and detracted from counsel's primary argument, that (consistent with his police statement) defendant had not killed anyone, planned to kill anyone or assisted in killing anyone in the burglary. In addition, almost no evidence was presented regarding the quantity and effects of the drugs consumed by defendant on the night of the murders or the effect consumption had on defendant. Defendant thus cannot demonstrate either deficient performance or

> prejudice in his counsel's argument relating to
> this subject.

*Cain*, 892 P.2d at 1255 (internal quotation marks omitted). The California Supreme Court summarily denied Cain's more developed ineffective assistance of counsel claim on habeas review, that was not limited to diminished capacity on the night of the murders.[5]

The district court held that the California Supreme Court's summary denial of Cain's claim was not unreasonable because "[t]he court may have reasonably concluded on habeas review that counsel reasonably relied on expert opinion in not presenting an intoxication or diminished capacity defense."

Cain's counsel was provided a psychological evaluation from Dr. Theodore Donaldson prior to trial. According to Dr. Donaldson, Cain "denied the use of illegal drugs or alcohol." Additionally, the district court referenced a report from Dr. Ronald Siegel concerning tests of Cain's hair for "the

---

[5] Cain maintains that the district court erred in basing its denial of habeas relief on the California Supreme Court's summary denial. Cain asserts that the California Supreme Court's decision on direct appeal is the operative decision under the AEDPA. However, the district court only referenced the summary denial for claims not addressed by the Supreme Court on direct review. We agree with the district court that the operative decision is the California Supreme Court's summary denial because its decision on direct review did not address Cain's more fully developed claim asserting ineffective assistance for failure to propose intoxication defense instructions for the special circumstance allegations. *See Cain*, 892 P.2d at 1255; *see also Ayala v. Chappell*, 829 F.3d 1081, 1094–95 (9th Cir. 2016).

presence of controlled substances." As the district court articulated:

> Dr. Siegel's report, dated May 9, 1988, states that he interviewed and examined [Cain] on April 17, 1988. Trial counsel delivered his guilt-phase closing argument on April 20, 1988. Dr. Siegel's report states, "Prior to the events of October 1986, [Cain] reported to me that he was high on beer and marijuana, but denied recent use of other substances. The analyses of hair samples indicated no detectable amounts of marijuana, cocaine, or other substances for the past 2.5 years . . ."

(internal quotation marks omitted). Thus, it appears that Cain's counsel did consult experts to investigate the efficacy of intoxication and mental health defenses. And it is not ineffective for counsel to refrain from pursuing jury instructions that have no basis in the evidence. *See Clabourne v. Lewis*, 64 F.3d 1373, 1381–82 (9th Cir. 1995). Accordingly, this claim fails on the merits. *See Strickland*, 466 U.S. at 689 (noting "the wide latitude counsel must have in making tactical decisions").

### 2. Penalty-Phase Ineffective Assistance of Counsel

Cain asserts that his counsel was ineffective in failing to investigate and present mitigating evidence based on Cain's substance abuse, neurological and psychological problems, and family background.

"[B]ecause the state court summarily denied [Cain's] penalty phase ineffective assistance claims, we must determine what arguments or theories could have supported the state court's decision; and then we must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court." *Gallegos*, 820 F.3d at 1037 (citation, alterations, and internal quotation marks omitted).  In the context of penalty-phase ineffective assistance of counsel, we have acknowledged that "the standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Cummings v. Martel*, 796 F.3d 1135, 1148 (9th Cir. 2015) (citation and alteration omitted).  "The multiple layers of deference create a standard that is difficult to meet, and even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. . . ." *Id.* (citation and internal quotation marks omitted).

"The first step in determining whether counsel's deficient performance prejudiced the defendant at the penalty phase is evaluating the totality of the available mitigation evidence. . . ." *Andrews v. Davis*, Nos. 09-99012, 09-99013, — F.3d —, 2017 WL 3255161, at *16 (9th Cir. Aug. 1, 2017) (citation and internal quotation marks omitted).  After the mitigating evidence is identified, a court weighs the strength of the mitigating evidence "by assessing its likely impact on a jury.  This weighing process includes evaluating whether its impact on the jury might be aggravating rather than mitigating." *Id.* at *17.  Courts may "consider the fact that mitigation may be in the eye of the beholder, and juries may find that some evidence offered as mitigation cuts the other way." *Id.* (citation and internal quotation marks omitted). We have also noted the Supreme Court's observation that "on

one hand, a jury could react with sympathy over the tragic childhood of the defendant, while on the other hand, the same testimony could establish the defendant's unpredictable propensity for violence that resulted in murder." *Id.* (citation, alteration, and internal quotation marks omitted). "Similarly, evidence of mental and emotional problems might suggest an increased likelihood that a defendant would be dangerous in the future. . . ." *Id.* (citation omitted).

"The second step in determining whether counsel's deficient performance prejudiced the defendant at the penalty phase is evaluating the weight of the aggravating evidence and any rebuttal evidence that the government could have adduced had the mitigating evidence been introduced." *Id.* (citations omitted). "Aggravating evidence may include evidence relating to the circumstances of the crime. Thus in *Strickland*, the Court found the aggravating evidence to be overwhelming where the defendant had repeatedly stabbed the three  murder victims during a robbery. . . ." *Id.* (citation and internal quotation marks omitted). "Rebuttal evidence may also directly undermine the value of the mitigation evidence." *Id.* at \*18. "For example, the Supreme Court [has] noted . . . . that it would be of questionable mitigating value for defense counsel to introduce expert testimony diagnosing a defendant with bipolar mood disorder and seizure disorders, because such evidence would invite rebuttal by a state expert, who could reject the diagnosis of bipolar disorder and offer a different diagnosis of antisocial personality disorder." *Id.* (quoting *Pinholster*, 131 S. Ct. at 1410) (internal quotation marks omitted).

The third and final step in assessing prejudice at the penalty phase "is to reweigh the evidence in aggravation against the totality of available mitigating evidence, in order

to determine whether there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* (citations, alteration, and internal quotation marks omitted). "A reasonable probability is a level of probability that undermines confidence in the outcome. . . ." *Id.* (citation, alteration, and internal quotation marks omitted). "The likelihood of a different outcome must be substantial, not just conceivable." *Id.* (citation and alteration omitted). "The Court has found a reasonable probability of a different outcome when scant and weak aggravating evidence could have been presented in rebuttal to strongly mitigating evidence." *Id.* (citation omitted). "By contrast, the Court has found no prejudice when the aggravating evidence is overwhelming, even though the mitigating evidence is strong." *Id.* (citation omitted).

Prior to trial, defense counsel retained Dr. Donaldson to conduct a psychological evaluation. Dr. Donaldson observed that "there were no indications of a thought disorder." Dr. Donaldson conveyed that:

> For the most part, results of psychological testing were highly consistent among tests and with the clinical impression. There were no indications of significant psychopathology nor indications of significant ego deficits or inadequacies in reality testing. The tests are most remarkable in a general lack of indications of serious psychological problems. Testing did indicate the existence of significant situational stress . . . Mr. Cain appears as an emotionally unstable personality

characterized by poorly controlled anger and a tendency to temper outburst.

Dr. Donaldson concluded:

Mr. Cain displays many of the features of sociopathy, although that is too simple a diagnosis, and there are also hysteroid and narcissistic features as well. His antisocial acting out appears to have not started until he was in his late teens, but indications are that this acting out has increased in frequency and severity at a rapid rate. This suggested the possibility of central nervous system dysfunction, but none was found in this evaluation, although that part of the evaluation was somewhat limited. Nonetheless, there were certainly no indications of gross brain disorder. Mr. Cain seems predisposed to episodic and violent acting out, and there are no indications in this evaluation that such episodes are the result of dissociation or psychosis.

Based on Dr. Donaldson's evaluation, Cain's counsel may have seen limited utility in presenting a defense premised on Cain's mental state. Dr. Donaldson referred to Cain's "sociopathy" and predisposition to "episodic and violent acting out" that were not the result of any "gross brain disorder" or psychosis. It would not have been unreasonable for the California Supreme Court to determine that Cain's counsel did perform an investigation and relied on Dr. Donaldson's evaluation in deciding to emphasize Cain's positive conduct during past incarcerations and his lack of

premeditation rather than Cain's troubled background and psychological impairments.

Cain argues that his counsel also unreasonably failed to follow up on certain "red flags" raised in Dr. Donaldson's report that "suggested the possibility of central nervous dysfunction," even though "none was found in [Dr. Donaldson's] evaluation" and Dr. Donaldson concluded that there were "certainly no indications of gross brain disorder." In support, Cain submitted a declaration from Dr. Donaldson more than a decade later stating that he "recall[ed] advising [Cain's counsel] that he might want to have Mr. Cain examined by a neuropsychologist." Given Dr. Donaldson's general difficulty remembering the details of his interactions with Cain's counsel, it would be reasonable to doubt whether that recommendation was ever made. But even if Dr. Donaldson's assertion is accepted as true, the state court could reasonably conclude that not all competent attorneys would pursue additional expert testing based on Dr. Donaldson's mere suggestion that certain dysfunctions "may" or "might" exist, especially where Dr. Donaldson's own report found no evidence of such dysfunctions. *See, e.g.*, *Leavitt v. Arave*, 646 F.3d 605, 609–10 (9th Cir. 2011) (concluding that an attorney was not required to pursue "red flags" in a medical report that could only be ruled out through further testing, given the other conclusions in the report that other causes were more likely); *see also West v. Ryan*, 608 F.3d 477, 488–89 (9th Cir. 2010) (same); *Pinholster*, 131 S. Ct. at 1406–07 (acknowledging that defense counsel may reasonably determine that a particular investigation is unnecessary).

Admittedly, the social and psychological evaluations conducted after Cain's conviction indicate that Cain was not

a typical child.  For example, a social history and evaluation conducted by Dr. Stanley Huey reflects the troubled criminal and psychological history of Cain's mother who died at Jonestown, the difficulties that Cain's stepmother had in taking care of the family's numerous children; the severe beatings and punishment meted out by his stepmother; Cain's untreated head injury in his childhood; and Cain's learning disabilities.  Although Cain's social and psychological histories may have provided potential mitigating circumstances, the additional background information is not sufficiently compelling to warrant habeas relief.  *See Cummings*, 796 F.3d at 1148–50.  Additionally, Cain's social and psychological histories could have "opened the door to inflammatory and prejudicial aggravating evidence." *Id.* at 1150.  Moreover, in light of the aggravating circumstances involving the brutal murders of a couple in their sixties, the thirteen blows administered to Mr. Galloway, the attempted rape of Mrs. Galloway, and Cain's prior violent acts, the state court's denial of this claim was not unreasonable.  *See Andrews*, 2017 WL 3255161, at \*18 (observing that "the likelihood of a different result must be substantial, not just conceivable" to establish prejudice) (citation and alteration omitted); *see also Strickland*, 466 U.S. at 687 (clarifying that to establish prejudice a defendant must show that he was deprived of a fair trial).  For the same reason, Cain's intoxication and substance abuse mitigation claims lack merit.[6]

---

[6] Cain also contends that the district court erroneously denied his request for an evidentiary hearing because Cain demonstrated a *prima facie* case that the state court unreasonably rejected his ineffective assistance of counsel claim.  However, "so long as we are reviewing a petitioner's claim under AEDPA, our review is limited to the facts before the state court and the petitioner is not entitled to an evidentiary hearing

### 3.  *Atkins*[7] **Claim**

Cain asserts that the California Superior Court unreasonably denied his *Atkins* claim because Cain demonstrated that he was intellectually disabled based on an IQ of 71 when considering Cain's adaptive deficits and the Flynn effect.[8]

The California Supreme Court issued an order to show cause why Cain's death sentence should not be vacated under *Atkins*.  In the subsequent Superior Court hearing on the order to show cause, two psychologists testified concerning Cain's alleged intellectual disability—Dr. Ricardo Weinstein and Dr. Efrain Beliz, Jr.  Dr. Weinstein had evaluated approximately thirty-five individuals to determine if they were intellectually disabled.  After administering several tests to Cain, Dr. Weinstein determined that Cain had a full scale IQ score of 71.  Dr. Weinstein also relied on a prior test from another psychologist reflecting that Cain had a full scale IQ score of 75.  Based on his consideration of the Flynn effect, Dr. Weinstein deducted points from Cain's IQ score and

---

in federal court."  *Murray v. Schriro*, 746 F.3d 418, 441 (9th Cir. 2014) (citation omitted).

[7] *Atkins v. Virginia*, 536 U.S. 304 (2002).

[8] "The basic premise of the Flynn effect is that because average IQ scores increase over time, a person who takes an IQ test that has not recently been normed against a representative sample of the population will receive an artificially *inflated* IQ score."  *Smith v. Ryan*, 813 F.3d 1175, 1184 (9th Cir. 2016), *as corrected*  (citation omitted) (emphasis in the original).  "This is because IQ scores are based on a normal distribution curve, and thus an individual's score is meaningful only in relation to the scores of the other people who took the same test. . . ."  *Id.* (citation omitted).

determined that Cain was "mildly mentally retarded." Dr. Weinstein also relied on Cain's school records in assessing Cain's adaptive behavioral deficits. The records reflected that Cain had several learning disabilities, particularly in the areas of verbal abilities, reasoning, and mathematics. Dr. Weinstein opined that:

> from childhood through the time of his current incarceration, Mr. Cain qualified for a diagnosis of mild Mental Retardation. IQ scores fell at or below the 70 to 75 range, which meets the AAMR [American Association on Mental Retardation] definition of intellectual functioning two standard deviations or more below normal. Moreover, Mr. Cain's adaptive functioning met the AAMR standards for mental retardation.

Dr. Beliz had evaluated approximately 6,000 individuals to determine if they were intellectually disabled. Dr. Beliz observed that Cain "has never been diagnosed in the past with fetal alcohol syndrome or affect, alcohol or drug dependency, or significant brain damage." According to Dr. Beliz, in 1977, Cain was administered the Peabody Picture Vocabulary Test and received "a standard score of 85, which is the low average range"; a Culture Fair Scale II test with a score of 75; and a Wechsler Intelligence Scale for Children with a "full scale score" of 78 and a "performance IQ score of 93." Dr. Beliz opined that "the performance IQ score of 93 is significant because one could not be mentally retarded and achieve this score on this part of this test." Dr. Beliz also noted that Cain received an IQ score of 64 on one test administered in April, 1977.

Dr. Beliz observed that, in 1980, Cain received a score of 73 on the Peabody Picture Vocabulary Test and a score of 87 on the Culture Fair Scale II Test. The records indicated that there was "no evidence of organic brain problems or impairments in cerebral functioning," although Cain suffered from learning disabilities. Dr. Beliz related that Cain "was never determined to be mentally retarded" in his school testing.

Dr. Beliz determined that Cain "expresses himself well and is able to carry on adult conversation. [Cain] was able to follow instructions, listen attentively for at least 30 minutes, and carry out instructions." Cain also "speaks in full sentences, asks appropriate questions about his environment, uses regular past tense verbs, modulates his tone of voice appropriately and provides complex directions to others." During Dr. Beliz's interviews, Cain "did not become confused, frustrated, or bewildered by test demands" and Cain "was well oriented with his attention and [his] concentration [was] not significantly impaired."

Dr. Beliz administered seven psychological tests to Cain during his evaluation and he did not adjust Cain's scores for the Flynn effect. Dr. Beliz concluded:

> Mr. Cain is not mentally retarded. There is no evidence to suggest that Mr. Cain has significant cognitive and adaptive limitations. . . . While test scores on particular instruments might yield extremely low scores suggestive of mental retardation, the scores can only be considered valid if the individual evaluated is a good fit with test scores. . . . In Mr. Cain's case, the fact that he scores low on

certain tests or that he exhibits soft neurological findings does not automatically translate into a diagnosis of mental retardation, particularly when he does not exhibit behaviors indicative of significant cognitive and adaptive limitations or neurological impairment.

In conclusion, there is absolutely no evidence for mental retardation. Mr. Cain is able to survey, organize, and integrate stimuli in a meaningful manner. Mr. Cain walks, talks, problem solves, socializes, thinks, reasons and interacts with others and his environment without significant difficulty. Cognitive and adaptive skills are adequately developed and free from significant impairment. . . .

The California Superior Court determined that Dr. Weinstein's testimony "suffer[ed] from a number of infirmities." According to the court, Dr. Weinstein relied on a prior psychological evaluation to support his conclusions, without acknowledging that the prior evaluation provided that Cain's "performance score suggests that he has the potentiality of operating within the average range of intellectual abilities" or that Cain's "low test scores reflected a possible learning disability," not an intellectual disability. Dr. Weinstein also failed to mention that Cain received a score of 85 on tests administered by the same psychologist.

The California Superior Court observed that Dr. Weinstein's application of the Flynn effect was unpersuasive in Cain's case because "the observation that there is a trend in a population toward rising IQ scores, even if credible (an

assertion which was not proven in this action), does not support the practice of applying a point correction to the IQ scores of individual persons." The court also opined that Dr. Weinstein applied the AAMR "recommended correction of 5 points twice."

The California Superior Court articulated that Dr. Weinstein lacked "significant experience in making determinations of whether persons are or are not" intellectually disabled. "More importantly, [Dr. Weinstein] committed himself to the opinion that the petitioner is mentally retarded early on in his work on this case, on skimpy information. Dr. Weinstein's subsequent work has been aimed at bolstering that initial opinion instead of objectively assessing [Cain]." The court concluded that Dr. Weinstein acted as "an advocate in this case," and that "Dr. Beliz provided the only credible expert opinion in this matter."

The California Superior Court noted that Cain's interview with a news reporter after the murders was included in the record. At the time of the interview, the reporter was interviewing neighbors of the slain couple, unaware that Cain was the murderer. The court observed that Cain "understood the nature of the interview and interacted normally with the interviewer. [Cain] clearly understood that it was in his best interests to feign ignorance of the crimes and that he should minimize his contact with the victims." According to the court, there was "no deficit in [Cain's] mental functioning observable from this evidence, which was fortuitously recorded very shortly after the murders." The court observed that Cain exhibited the same behavior during his police interview.

"[T]he Eighth and Fourteenth Amendments to the Constitution forbid the execution of persons with intellectual disability. . . ." *Hall v. Florida*, 134 S. Ct. 1986, 1990 (2014) (citation omitted). In order to demonstrate that a defendant is intellectually disabled "an IQ between 70 and 75 or lower is typically considered the cutoff IQ score for the intellectual function prong." *Brumfield*, 135 S. Ct. at 2278 (citation and alteration omitted). The Supreme Court has articulated that "the medical community defines intellectual disability according to three criteria: significantly subaverage intellectual functioning, deficits in adaptive functioning (the inability to learn basic skills and adjust behavior to changing circumstances), and onset of these deficits during the developmental period." *Hall*, 134 S. Ct. at 1994 (citations omitted). The Supreme Court has furthered concluded that "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." *Id.* at 2001. Our general assessment of Cain's *Atkins* claim leads us to conclude that Cain is not entitled to habeas relief. *See Hall*, 134 S. Ct. at 2001 (articulating the standard for determining intellectual disability).[9]

Cain's claim turns essentially on a battle of experts between Drs. Beliz and Weinstein. The state court reviewed the expert testimony for both in detail, and gave numerous

_____

[9] Cain contends that the Supreme Court's recent decision in *Moore v. Texas*, 137 S. Ct. 1039 (2017) suggests that he is entitled to relief on this claim. However, *Moore* is not an AEDPA case and thus does not address the difficult burden Cain bears to prove his entitlement to relief under AEDPA standards. Morever, having been decided just this spring, *Moore* itself cannot serve as "clearly established" law at the time the state court decided Cain's claim. *See Greene v. Fisher*, 565 U.S. 34, 44 (2011).

specific reasons to support its determination that Dr. Beliz was more credible.  At most, Cain's arguments might show that there *could* have been reasons to credit Dr. Weinstein's findings.  But this does not overcome his much more difficult burden under AEDPA to show that the state court acted *unreasonably* in concluding that Dr. Beliz's report was more credible.  *See Wood v. Allen*, 558 U.S. 290, 301 (2010); *Jamerson v. Runnels*, 713 F.3d 1218, 1224 (9th Cir. 2013).

### 4.  Cumulative Error

Cain asserts that he is entitled to habeas relief due to cumulative error based on a litany of trial errors and ineffective assistance of counsel.  However, Cain is not entitled to relief on a theory of cumulative error because he was not "denied . . . a trial in accord with traditional and fundamental standards of due process."  *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).

## IV.    CONCLUSION

The California Supreme Court's determination that Cain received adequate notice of the attempted rape special circumstance was not unreasonable.  The amended information specifically alleged a special circumstance premised on Cal. Penal Code § 190.2(a)(17), which encompassed attempted rape.  Cain's counsel also acknowledged that Cain received adequate notice of the special circumstance and that Cain was not prejudiced by the prosecution's arguments premised on attempted rape.  Thus, Cain received constitutionally adequate notice of the special circumstance.  In any event, Cain does not challenge the jury's verdict that he was eligible for the death penalty based on the first-degree murder of Mr. Galloway and the

associated special circumstances that were entirely unrelated to attempted rape.

After expanding the certificate of appealability to include previously uncertified claims, we conclude that, upon further consideration, these claims lack merit.

**AFFIRMED.**